[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-10325

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 13, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00001-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MEIER JASON BROWN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(March 13, 2006)

Before DUBINA, BARKETT, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, Meier Jason Brown appeals his conviction and death

sentence imposed by the United States District Court for the Southern District of

Georgia. A jury found him guilty of 1) murder within the territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111; 2) murder of a federal employee (a postal worker), in violation of 18 U.S.C. § 1114; and 3) robbery of federal property ($1175 in postal money orders), in violation of 18 U.S.C. § 2114. The jury recommended that Brown should be sentenced to die for the murder convictions; and the district judge imposed a death sentence, along with 300 months in prison for the robbery.

Brown timely appealed, arguing that the district court made evidentiary and constitutional errors, inappropriately conducted voir dire, and violated both Brady v. Maryland, 373 U.S. 83 (1963) and Miranda v. Arizona, 384 U.S. 436 (1966).[1] After thorough review, we affirm.

## I.

---

[1] Specifically, Brown contends that the district court erred by: 1) refusing to suppress statements allegedly obtained without Miranda warnings; 2) refusing to conduct an evidentiary hearing on Brown's motion to suppress improper and suggestive identification evidence; 3) finding that the government did not improperly withhold Brady material; 4) quashing Brown's subpoena for the production of state records; 5) denying Brown's motion to prohibit the death-qualification of jurors; 6) denying Brown's motion for bifurcated voir dire; 7) asking certain questions in the process of death qualifying the jury; 8) excusing juror Fahey; 9) telling a juror that Brown had entered a guilty plea; 10) allowing hearsay testimony at both the guilt-innocence and penalty stages of the trial; 11) allowing the introduction of certain crime scene photos; 12) finding the Federal Death Penalty Act constitutional; 13) denying certain funds for expert assistance at the penalty stage; 14) denying Brown's motion for a directed verdict as to the pecuniary gain aggravating factor and in instructing the jury regarding that aggravating factor; and 15) denying Brown the right to be present and to cross-examine witnesses after this Court remanded the case for construction of the record.

The facts of this tragic case are straightforward and are taken from the testimony of the trial witnesses and from the last of Brown's three confessions, which was recorded and presented to the jury by audiotape.

The victim, Sallie Gaglia, was a part-time postmistress in the small town of Fleming, Georgia. She was working in the Fleming Post Office on the morning of November 30, 2002, when she was stabbed to death. One of her co-workers, Darlene Marie Washington, was working in the Post Office with Gaglia between 8:00 a.m. and about 9:30 or 9:45 a.m. that day. During that time, a black male came into the Post Office to retrieve mail from box 327, which Washington knew belonged to the Morgan and Brown families. According to Washington, Gaglia asked the man his name, and he gave three replies that neither woman could understand, although Washington believes he uttered a name that began with the letter "M." As he was exiting the Post Office, Washington heard the man say his name was "Jason." Washington did not get a good look at him and could offer nothing more in the way of a description than his sex and skin color. Washington left the Post Office before Gaglia was killed.

Jennifer Zech and Stephen Nichols discovered Gaglia's body when they stopped in the Post Office to get their mail sometime around 10:45 a.m. on November 30th. When they found her, Gaglia was lying on the floor behind the

3

customer counter in the Post Office with what appeared to be a blood stain on her back. Gaglia did not respond to Nichols' shouts, so he jumped through the customer service window and again tried to elicit a response. Nichols opened the door leading into the customer waiting area so medical responders would have access to the victim.

While Nichols was in the Post Office, Zech ran to a nearby house and asked the owners to call 911. Linda Ashcraft, a volunteer firefighter who lived nearby, testified that a man came to her house and told her that someone at the Post Office needed help. Ashcraft and her husband, who was also a first responder and firefighter, responded to the Post Office and performed CPR on Gaglia. When they found Gaglia, she was lying face down with "a lot" of visible blood. Ashcraft noticed two holes in the back of Gaglia's sweater and knife wounds in Gaglia's back. EMS personnel arrived shortly thereafter and declared Gaglia dead.

Although there were no actual eyewitnesses to the stabbing, several people testified to seeing a person fitting Brown's description at the Post Office around the time the crime occurred. Among others, Frank Kania said that he stopped by the Post Office to pick up his mail around 10:25 or 10:30 a.m., had a brief conversation with Gaglia, and returned to his truck, where he sat for one or two minutes while he looked through his mail. Kania said that while he was sitting in

4

his truck, he noticed a black male on a bicycle riding toward the Post Office. The bicyclist wore a hooded sweatshirt. Kania drove off before the suspect arrived at the Post Office, but as he was driving away, he observed through his rear-view mirror that the black male got off his bike and walked into the Post Office. Several days later, Kania selected Brown from a photo line-up given to him by investigators, noting that Brown had "the closest resemblance" to the man he saw on the bike.

Chris Bowen testified that he too drove by the Fleming Post Office around 10:30 or 10:35 a.m. on November 30th. He saw a slender black male, approximately 5'10" to 6' tall, dressed in a dark, hooded jogging suit, sitting on a bicycle in front of the Post Office door. The man caught Bowen's eye because he was wearing white gloves on a day that was not "all that cold." Bowen, who was driving about ten miles per hour, made eye contact with the suspect, but did not stop at the Post Office. Like Kania, Bowen later selected Brown from a photo line-up, noting that although he was not one hundred percent sure, he thought Brown was the man he saw at the Post Office that fateful morning.

Postal inspectors performed an accountability study at the Fleming Post Office the day Gaglia was murdered. They determined that $1,266.59 in cash was missing from the till and that four money orders had been issued in the amounts of

5

$20, $500, $500, and $175.[2]  The cash drawer contained approximately $103.91.

At trial, the government introduced numerous crime-scene photographs depicting the location and position of Gaglia's body and blood stains found in the Post Office.  The government also offered a receipt tape recovered from the Post Office calculator showing the numbers 500, plus .90, plus 500, plus .90, and then the number 175 with a division sign.  A postal employee explained that the cost of purchasing money orders up to $500 was $.90, thus suggesting that someone in the Post Office calculated the amount due for the purchase of three money orders with denominations of $500, $500, and $175.  Moreover, the government introduced the picture of a shoe print recovered from the top of the customer service counter that separated the public portion of the Post Office from the employee work area where Gaglia's body was found.  No fingerprints were found in the Post Office.

The Deputy Chief Medical Examiner for the Georgia Bureau of Investigation performed an autopsy on Gaglia.  He testified that the victim had been stabbed ten times, two of which could have caused Gaglia to die within a short period of time.  The doctor further noted that two of the non-fatal wounds were to the victim's extremities: a half-inch laceration on the anterior surface of her left forearm and a three-quarter inch stab wound on the back of her left wrist.

---

[2]Brown was indicted for robbing the $500, $500, and $175 money orders.  The status or location of the $20 money order is not at issue in this case.

6

He explained that when an individual receives multiple stab wounds, cuts found on the extremities are classically described as "defensive" types of injuries.

On December 5, 2002, police conducted simultaneous searches at the homes of Sadie Brown (Brown's mother) and Diane Brown.[3] Although armed with search warrants issued by a magistrate, the officers received consent to search from both Sadie and Diane. At Sadie's house, police recovered a brown "cargo or field type" jacket and the bike that Brown allegedly used to transport himself to and from the Post Office. Notably, the police found blood stains on the jacket, and a DNA analyst testified that the DNA profile of those samples matched the DNA profile of Sallie Gaglia's blood. He further stated that the probability of randomly selecting an unrelated individual with the same DNA profile is one in 25 quadrillion[4] from the Caucasian population and one in 100 quadrillion from the African-American population, leading him to conclude that "within a reasonable degree of scientific certainty, Sallie Gagila [sic] is the source of the major component profile obtained from the . . . jacket." Dietrechusn Davis, the defendant's cousin, testified that on the morning of November 30, he remembered seeing Brown wearing the brown

---

[3]There are several people involved in this case who have the surname "Brown." We refer to the defendant, Meier Jason Brown, as "Brown." As for the other members of the Brown family, we first refer to them by their full names and thereafter by only their first names.

[4]The DNA analyst testified that a quadrillion is equal to one million multiplied by one billion. So, 25 quadrillion would be represented by the number 25 followed by fifteen zeros, or 25,000,000,000,000,000.

jacket investigators later recovered from Sadie's house.

At Diane's house, the police found a pair of Lugz sneakers with a tread that, according to a forensic scientist who testified at trial, "was similar in size and geometry" to the tread design of the shoe print left at the crime scene in the Post Office. Additionally, the police found three money order receipts at Diane's house, one in the amount of $500 made payable to Chase Manhattan Mortgage, one in the amount of $423.08 made payable to Chase Manhattan, and one in the amount of $175 made payable to Diane's bankruptcy trustee.

Dietrechusn Davis also testified that he was in Sadie's home on the night of December 5, 2002, when Sadie received a phone call. Davis, who heard only Sadie's portion of the conversation, heard her say "Meier, where you at? Meier, you didn't kill that lady, no." At that time, Sadie started crying, and Davis left the room.

The defendant Meier Jason Brown was present at Diane's house when investigators conducted the search on December 5, 2002. He talked with officers while they were in the house and proceeded to confess three separate times to the murder of Sallie Gaglia: once in the house before he was given <u>Miranda</u> warnings and arrested, once in the house after he was given <u>Miranda</u> warnings and arrested, and once the following morning at the Liberty County Jail. Only the jail

8

confession was recorded, and it was played in its entirety for the jury at trial.

Postal Inspector James Rushwin spoke with Brown at Sadie's house on December 5, explaining to Brown that investigators were speaking with everyone who may have been at the Post Office on November 30, 2002. He asked if Brown would be willing to talk to the police. Brown said he would, and the interview was conducted by Rushwin and Detective Charles Woodall from the Liberty County Sheriff's Department.

Brown told investigators that he was at the Fleming Post Office on the morning of November 30, 2002, around 8:30 a.m., to retrieve his family's mail from their post office box. He said he rode his Uncle Junior's bike to and from the Post Office and had a brief conversation with Sallie Gaglia after she asked him his name. After leaving the Post Office, Brown said he stopped at Annie Jo Scott's house and visited with her for several minutes before returning to his mother's home to distribute the mail. Brown initially denied returning to the Post Office at any time on November 30th.

Later in the same conversation, Brown changed his story, this time telling the police that after distributing the mail to his family, he stole $1300 from a stash that his cousin Cedric had buried in the woods behind Sadie's house. He claims to have returned to the Post Office and used the stolen money to purchase three

9

money orders: two for $500 each and one for $175. Brown said he needed the money orders so that Diane Brown could pay her mortgage and her bankruptcy trustee.

In yet a third version of the story, Brown admitted returning to the Post Office with a knife to rob Gaglia. He said he rode his bicycle to the Post Office and ordered three money orders in the denominations noted above. He claimed that when Gaglia turned away from the counter to calculate the amount due, he jumped over the counter, tripped, and fell into her, thereby cutting her with his knife. He told the investigators that at that point he decided he had to kill her because she knew him. Brown said he took Gaglia's wallet from her purse, crawled through the counter window, got back on his bike, and rode home. He discarded the knife and the socks he wore on his hands somewhere between the Post Office and his mother's house and said he buried the wallet in his backyard, although neither the wallet nor the knife and socks were ever located. Brown also said that after returning home, he washed his clothes and called Diane to pick him up. She arrived approximately one hour later. Brown explained that he gave the money orders to Diane the next day.

After giving this confession to the police, Brown picked up the phone, dialed, and someone answered. Rushwin testified that "[Brown] said, 'bitch, just

10

give the phone to Mom.' And then he said, 'Mom,' he says, 'I love you.' He said, 'it was an accident.' He said, 'don't hate me, Mama.' He said it was an accident. And he said 'bye, Mama, bye.' And hung up." Shortly thereafter, Brown was arrested and advised of his Miranda rights. He waived those rights and repeated the entire confession to the officers. Diane subsequently came into the room, and Brown told her that he went to the Post Office to rob Gaglia and that he fell into her and cut her.

Brown was transported to the Liberty County Jail on the night of December 5, 2002. The next morning, again after being given his Miranda warnings, Brown gave an audio-taped confession to Detective Woodall and Postal Inspector Henry Reeves. Brown stated on the tape that he had been advised of his rights and he was waiving those rights and talking to the police. Brown reiterated many of the facts he had told the police the previous day. He confirmed that he rode a bicycle to the Post Office on the morning of November 30 to retrieve his family's mail and had a brief conversation with one of the postal workers. He returned to his mother's house and then went back to the Post Office to rob Gaglia. On the way, he stopped to see Ms. Annie Jo Scott, who gave him some canned goods for his mother. From there, Brown proceeded to the Post Office. Brown stated:

> I went inside, and I asked the lady for the money orders. She made them. Uh, I jumped across the little thing, and I tripped, and

11

accidentally cut her. And when I cut her, I got scared as hell, man. I didn't go there to hurt her, honest to God I didn't.

Brown stated that he brought the knife with him solely to "intimidate" Gaglia and that he placed socks over his hands prior to jumping across the counter. Brown said that he took the money orders and Gaglia's wallet, jumped back through the counter window, and returned to his mother's house, discarding the knife and socks along the way. After returning home, he put his clothes in the wash and called Diane to pick him up.

Despite several questions from the investigators, Brown was unable to remember (or relate) any specific details about what happened between when he first cut Gaglia and when he rode his bike back to his mother's house. Detective Woodall asked "So, after you accidently cut her, what was the next thing you remember happening?" Brown responded, "Honestly, me throwing that knife." Brown said he was surprised to learn that Gaglia had been cut more than three times, and he stated that she never said anything during the incident or attempted to put up a fight.

Diane Brown testified at trial and supplied some details about what she and Brown did after he committed the robbery and murder. Diane testified that Brown called her on the morning of November 30 and asked her to pick him up at his mother's house, the two having already discussed their plans to spend the day

12

together. She picked him up and then drove to her house near Savannah, and, while they were stopped to buy some cigarettes and alcohol, Brown showed her three money orders, which he said would be enough to pay her mortgage and her bankruptcy trustee. Two of the money orders were for $500, and one was for $175. Diane said that at the time she needed $927 to pay her mortgage and $175 to pay her bankruptcy trustee. She did not ask Brown where he got the money orders, and he did not volunteer that information.

Diane and Brown went to a bank in Fleming on the following Monday, December 2, 2002. She cashed one of the $500 money orders. Later that day, Diane used the proceeds to purchase another money order for $423.08, which, when combined with the remaining $500 money order, was sufficient to cover her mortgage payment. The three money orders Brown showed Diane were introduced at trial. A postal inspector testified that the serial numbers on the three money orders matched the serial numbers of the three money orders stolen from the Post Office. The government also introduced the $423.08 money order made out to Chase Manhattan.

The jury convicted Brown on all three counts. The district court then proceeded to the penalty phase of the trial, which was conducted before the same jury that heard the guilt phase. The government called six witnesses. Irwin

13

Frazier, Brown's former parole officer, testified that Brown had previously been convicted of driving under the influence (twice), forgery (twice), driving with a suspended license, robbery, theft by taking, and financial transaction card fraud. Frazier said that Brown had been on parole in 2001, but that it had been revoked and Brown was returned to prison because he had been charged with fraud. Randy Graham, a former Liberty County Detective, testified that Brown had admitted to committing a robbery at a Liberty County convenience store in March of 1996. He stated that when detectives initially confronted Brown with evidence of the robbery, Brown denied any involvement and only admitted his role after being shown even more evidence confirming his presence during the crime.

Darlene Washington, one of Gaglia's co-workers, testified that Gaglia was a sweet person who always helped people in any way she could. Catherine Webb, Gaglia's sister, testified that the murder had been extremely difficult for Gaglia's husband, Joe, and her two sons, Scott and Craig. She said that Craig had planned to attend college, but decided to forgo his plans because of the emotional strain caused by his mother's death. Betty Cox, another of Gaglia's siblings, testified about the things she used to do with Gaglia and how she missed her sister. Finally, David Clark, Gaglia's brother, testified that Gaglia enjoyed her job at the Post Office because it allowed her to meet and help people. He added that she was

generous and kind and she would be missed by her family.

The defense presented fourteen mitigation witnesses. Brown's father, Pelham Brown, had left the home when Brown was seven years old, after shooting Brown's older brother. Alexis Andrews, a retired Liberty County Assistant Jail Administrator and a neighbor of Brown's, testified that Brown grew up in a household plagued by fighting, drinking, drugs, and stabbings. She also said that she got to know Brown when he was in prison and that he was a very good inmate who never had disciplinary problems. She recounted that he was selected to be a prison trustee, a position reserved for clean inmates with good manners. She indicated that Brown was active in the jail church.

Beverly Bonaparte, Brown's sister, testified that Brown was hard-working and that he cared for his mother, who was in poor health before she died. Joseph Bonaparte, Brown's brother-in-law, said that Brown was a likeable person who cared deeply for his mother. John T. Wilcher, the Assistant Jail Administrator for Chatham County, testified that Brown had been an inmate on several occasions and that he had never caused any disciplinary problems in jail. Linda Jones, one of Brown's former teachers, described Brown as well-mannered and polite. She indicated that his parents showed no interest in his education. Vanessa Montgomery Parker, Brown's former school social worker, also described Brown

as well-mannered. Patricia Morgan, Brown's sister-in-law, described Brown as a sweet, caring man who loved his mother. Steve Murray, Brown's former employer, said Jason was a dependable worker who was nice to customers. Davis Williams, who attended church with the Brown family, observed that Brown was well-mannered and that he helped his mother attend church through her declining health. Pastor B.T. Smith testified that the Browns were God-fearing people and urged the jury to spare Brown's life. Jimmy Wainwright, another of Brown's former employers, added that Brown was dependable, hard-working, and honest. Wainwright also stated that Brown's home was marred by fighting, shootings, stabbings, and drug use. Dexter Morgan, Brown's brother, said that Brown was a loving person and urged the jury to show him mercy. Finally, Detective Woodall testified on Brown's behalf. He noted the poor conditions under which Brown was raised. Moreover, Detective Woodall stated that he believed Brown was remorseful during his confession.

The jury unanimously recommended that Brown be sentenced to die. The district court imposed a death sentence, along with 300 months imprisonment for the robbery. Brown's appeal was timely filed, and we now consider each of his arguments in turn.

**II.**

16

**A. Miranda**

First, Brown claims that the district court improperly refused to suppress the pre-arrest confession that he gave at Diane's house on December 5, 2002. He says that the initial confession was obtained unconstitutionally and that it tainted the two subsequent confessions; therefore they should have been suppressed pursuant to the Supreme Court's decision in Missouri v. Seibert, 542 U.S. 600 (2004). The magistrate judge conducted an evidentiary hearing on Brown's motion to suppress and issued a Report and Recommendation (R&R) in which he recommended denying the requested relief. The district court adopted the R&R. In reviewing a motion to suppress, findings of fact will be upheld unless clearly erroneous, but the application of the law to those facts is reviewed de novo. United States v. Muegge, 225 F.3d 1267, 1269 (11th Cir. 2000).

At the suppression hearing, the government called four police officers;[5] the defense called Brown. The first officer, Postal Inspector James Rushwin, testified that seven officers arrived at Diane's home on December 5, 2002, armed with a search warrant, and received her consent to search her house and car for items connected to the Fleming Post Office murder. Rushwin said that the officers approached the house without their weapons drawn, knocked on the door, and

---

[5]Postal Inspector Marla McLendon's testimony related primarily to the simultaneous search that was being conducted at Sadie's house, which Brown does not challenge.

17

identified themselves as police officers when Brown let them in.  Rushwin spoke privately with Diane in an adjoining room, told her the officers were investigating the murder of Sallie Gaglia, and asked her if she would allow them to search her house and car.  She indicated that she was a corrections officer and would cooperate with the police.  Rushwin produced a consent-to-search form for both the house and the car and explained them to Diane.  She signed both forms, after which Rushwin performed an initial walk-through of the house.  During the walk-through, he noticed two pairs of sneakers, one of which had a tread similar to the shoe print found at the crime scene.

Rushwin testified in these words regarding his initial encounter with Brown:

Q. 	[Assistant United States Attorney]: And you talked to Mr. Brown about having a conversation with him at that time?

A. 	[Inspector Rushwin]: Yes, I did.  I said -- I asked him -- I told him that we were talking with everyone that may have been [in] the Post Office on Saturday, the day of the murder, and asked if he would talk with us.

Q.: 	What did he tell you at that time?

A.: 	 And he said he would.

Q.: 	Did you advise him of anything with regard to his custodial status?

A.: 	Yes, I did.

Q.: 	What did you tell him?

18

A.: I advised him that he was not in custody. He wasn't under arrest, and that he was free to go at any time.

Q.: What [was] his response to that?

A.: He said, "I'll talk to you."

Rushwin told Brown that he wanted Liberty County Police Detective Chuck Woodall to sit in on the discussion and asked Brown if he would mind going to the police department for the interview. Brown responded that he would be willing to go to the station, but that he needed to put on a pair of shoes.

Rushwin then told Brown he would accompany him into the other room to retrieve Brown's shoes, explaining that he was going with Brown "for my safety and yours, for safety reasons." When Brown attempted to put on the sneakers with the suspicious tread, Rushwin informed him that the police would be taking them as evidence and that Brown could not wear them. Brown indicated he had no other shoes, that the additional pair of sneakers was not his, and that he did not want to go outside barefoot. Rushwin then asked Brown if he would be willing to talk at the house, and Brown said he would. The two decided to wait for Detective Woodall to arrive before they began talking, and Rushwin described the situation in these terms:

> Well, we sat down at the dining room table. And I again informed Jason that he wasn't under arrest, not in custody, and he was free to go at any time. I again explained that we were talking to people that may

19

have been at the Post Office on Saturday. And he said he understood.

While they waited, Brown "sat around and smoked, and did whatever he wanted to do." Once Detective Woodall arrived, Brown and the two officers sat at the dining room table. They advised Brown, for the third time, he was not under arrest and was free to leave:

> Q.   [Assistant United States Attorney]: Did you again ask for Mr. Brown's consent to speak?
>
> A.   [Inspector Rushwin]: Yes. He again was advised by both Detective Woodall and I that he wasn't under arrest, in custody and, you know, he was free to leave at any time. He said he understood Detective Woodall. And I said that we're trying to talk to everyone that may have been at the Post Office. And he said, "yeah, I know."

Inspector Rushwin's account is corroborated by Detective Woodall, who testified that

> I told [Brown] initially he was not under arrest. I told him numerous times that -- I mean, that he was free to leave. Several times he asked about getting things. And we talked about -- I told him specifically he could do anything he wants. We were in his house with his consent and the consent of the young lady.

During the ensuing conversation, Brown confessed to the murder and robbery at the Post Office, as detailed above. At one point during the interview, it appeared to the officers that Brown was distracted by Diane and the other investigators who were walking in and out of the kitchen, so they asked him if he

20

would be more comfortable in the sitting room. Brown said that he would, and he got a can of soda and a cigarette as he moved to the other room.

Detective Woodall testified that although some of the investigators conducting the search of Diane's home were armed, the officers who interviewed Brown did not have weapons. Investigator Rushwin stated that there was an officer in the front yard of Diane's house armed with a shotgun when police originally entered the house, but that the weapon was returned to the police car shortly thereafter.

Investigator Herbert Dewayne Martin testified that he stayed with Brown after the officers originally entered the house. Martin said that he asked Brown to sit in a chair for about fifteen minutes while Rushwin was obtaining consent to search from Diane. As a safety precaution, Martin told Brown to let him know before he made any sudden movements, such as getting up from the chair or reaching into his pockets. Martin also testified that he later participated in the interview, for approximately thirty minutes or an hour, during which time he told Brown that some of the officers did not believe parts of his story.

Brown testified at the suppression hearing and gave a sharply different account. He said that police entered the house with guns drawn, grabbed Diane by the arm, and ordered him to sit in a chair. Brown asserted that he was not free to

21

move about the house and, notably, was <u>never</u> told that he was free to leave. Brown said "I wanted to leave when they first came. They never indicated that I could leave, you know. One officer even stated, the guy that was standing at the door, he stated if I get up that was going to be the worse [sic] mistake I could possibly make." Brown contends the officers coerced him into confessing by telling him they had Diane in handcuffs and were going to "lock her up, and take her child."

The magistrate judge made two critical factual findings: first, that Brown was repeatedly told he was not under arrest and was free to leave at any time; and, second, that Brown <u>understood</u> he was not under arrest and was free to leave at any time. Specifically, the magistrate judge found that Inspector Rushwin "advised defendant [when he first spoke with him] that he was not under arrest and that he was free to go at any time. In response, defendant said, 'I'll talk to you.'" Moreover, the magistrate judge found that while Rushwin and Brown were waiting for Detective Woodall to arrive,

> Inspector Rushwin again told defendant that he was not under arrest, was not in custody, and was free to go at any time. When Detective Woodall arrived, he and Inspector Rushwin explained to defendant before they began the interview that he was not under arrest and was free to leave at any time. Defendant said he understood.

Additionally, the magistrate judge, plainly rejecting Brown's account, found that

22

the officers conducting the interview were not armed, that Brown voluntarily moved around the house, and that he was never ordered to stay in any particular location.

Based on those factual findings, the magistrate judge concluded that Brown was not in custody at the time he spoke with the officers and, therefore, was not entitled to be given <u>Miranda</u> warnings:

> Inspector Rushwin and Detective Woodall testified that they reiterated to defendant multiple times that he was not in custody, was not under arrest, and was free to leave at any time or do anything he wanted. Defendant clearly understood this explanation, as demonstrated by both his words and actions. He indicated to Inspector Rushwin that he understood and was willing to talk with the officers, and Inspector Rushwin testified that defendant got up, moved around, got a drink, and picked up the phone to call his mother without requesting the officers' permission.

We are bound by a trial court's findings of fact unless they are clearly erroneous. See <u>Muegge</u>, 225 F.3d at 1269. The record amply supports the findings that Brown was repeatedly told he was not under arrest and was free to leave <u>and</u> that he understood that warning, indeed that he expressly said he understood those words. Although Brown's account was sharply different, the magistrate judge, who observed the witnesses, was free to believe those he found trustworthy and discredit the testimony of those who were not. See <u>United States v. Brown</u>, 415 F.3d 1257, 1267 (11th Cir. 2005) (noting that "[t]he credibility of a

23

witness is in the province of the factfinder, and we will not ordinarily review the factfinder's determination of credibility" (quotation marks and citation omitted)). The district court's factual findings were not clearly erroneous and will not be disturbed on appeal.

It is by now undisputed that the right to Miranda warnings attaches when custodial interrogation begins. United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004). A defendant is in custody for the purposes of Miranda when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quotation marks omitted); see also United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001). Whether Brown was in custody prior to his formal arrest "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." McDowell, 250 F.3d at 1362 (quotation marks and alterations omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." Id. (emphasis added).

24

After reviewing the totality of the circumstances, we conclude that Brown was not in custody when he gave his initial confession to the police. First, and most important, he was told no less than three times by two different officers that he was not under arrest, not in custody, and was free to go at any time. As we recently held in Muegge, the fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave. In Muegge, we made the point this way:

> [i]f the individual being questioned were innocent, and was told directly he might leave, in the absence of evidence to the contrary the interrogation was non-custodial as a matter of law. There may be situations where the restraints placed on a suspect's freedom are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview, but that is not the case here.

225 F.3d at 1271. Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are "so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." Id.

We are not alone in recognizing the importance of a police officer's admonition that a person is free to leave. The Eighth Circuit noted that "abundant advice of freedom to terminate the encounter should not be treated merely as one

25

equal factor in a multi-factor balancing test" and concluded:

> That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review, United States v. Lee, 699 F.2d 466, 467-68 (9th Cir. 1982) (per curiam)), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.

United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004). See also United States v. Salvo, 133 F.3d 943, 951 (6th Cir. 1998) (noting that a statement from officers that a suspect is not in custody and free to leave is an "important factor" in determining that the suspect is not in custody); United States v. Collins, 972 F.2d 1385, 1405 (5th Cir. 1992) (finding defendants were not in custody where they were "told explicitly and repeatedly that they were not under arrest and were free to leave"); United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (noting that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will" (quotation marks omitted)).

The additional finding of fact that Brown said he understood the officers' advice that he was not under arrest and was free to leave strengthens the force of

the instructions.  See, e.g., United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005) (noting that "we think that it is highly significant that [the officer] informed [the defendant] at the outset of the interview that [the defendant's] presence was voluntary -- information that [the defendant] actually understood, given his statements on the audio tape").  These facts weigh heavily in favor of a finding that Brown was not in custody.

Second, it is significant that the interview took place in Diane's home, a place where Brown often resided.[6]  Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, "'[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home." United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting 1 W. LaFave, Criminal Procedure § 6.6(e), at 496 (1984 & 1991 Supp.)); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (noting that "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial"); United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991) (stating that a court should consider whether the suspect was questioned in "familiar or at least neutral surroundings" (quotation marks omitted)); United

---

[6]Brown testified that his "primary" residence was his mother's home, but said that he was in a relationship with Diane and spent time at her house as well.

States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985) (finding it relevant in determining that defendant was not in custody that the questioning occurred in the defendant's home, "on his own turf" (quotation marks omitted)).  Brown undeniably was in a familiar setting when the interview occurred; indeed, the discussions took place in Diane Brown's dining and living rooms.  Although an officer accompanied him throughout the house for safety reasons, he was free to eat, smoke, use the phone, and move about as he wished.  The fact that Brown was in a familiar setting also weighs in favor of a non-custodial finding.

No particular fact in the "custody" analysis is outcome determinative -- we simply weigh the totality of the circumstances.  Thus, even having been told by the officers that he was not in custody and was free to leave does not inexorably lead to the conclusion that Brown was not in custody.  But, as we held in Muegge, Brown needs to establish "extensive" restraints in order to overcome a finding that under these circumstances a reasonable person would have understood he was free to leave or terminate the interview at any time.  He has failed to do so.

The only piece of evidence that weighs in favor of finding that Brown was in custody is the fact that the police confiscated his shoes.  On this record, however, that lone circumstance falls far short of evidence of "extensive" restraints.  While Brown was not free to wear his sneakers, he did have other options (albeit

28

imperfect ones) for leaving the house. He could have gone outside barefoot, he could have worn the other pair of sneakers that belonged to someone else, he could have walked the short distance to Diane's car, or he could have called a friend for a ride. Although he was plainly and repeatedly told he was free to go, he never tried any of those options; indeed, he never even told anyone he wanted to leave.

Moreover, Brown never exercised the most basic method at his disposal for avoiding discussions with police -- simply not talking to them. Despite what he was told, he voluntarily remained in the house <u>and</u> chose to speak with the police. The fact that police confiscated his shoes, standing alone, cannot convert what is a non-custodial situation into a custodial arrest when: (1) Brown was repeatedly told he was not under arrest and was free to leave; (2) he said he understood this; (3) he was in the familiar and comfortable surroundings of his girlfriend's home; (4) the interviewing officers were not armed; (5) he was never handcuffed or otherwise physically restrained; (6) he was free to use the phone (which he did); (7) he was free to move about the house (which he did); and, finally (8) no other indicia of coercion is cited by the factfinder.

Accordingly, we conclude that Brown was not in custody when he first confessed to robbing and murdering Gaglia, he was not entitled to <u>Miranda</u> warnings, and the statements need not be suppressed. Moreover, because Brown's

29

Seibert arguments, which are related to the second and third confessions, are wholly dependent upon the suppression of the first, we conclude that all of the statements were legally obtained.

**B.     Hearing On Identification Evidence**

Before trial, Brown moved to suppress all out-of-court identifications.  In that motion, he urged the district court to hold an evidentiary hearing.  The trial court refused to suppress the identifications and declined to conduct an evidentiary hearing because Brown failed to present any evidence that the methods used by the investigators were unduly suggestive or coercive.  The magistrate judge expressly said that if, after viewing the photo-lineup, Brown had any evidence supporting the notion that the government had employed suggestive techniques, he would hold an evidentiary hearing at that time.  Brown never made such a showing, and no hearing was held.  We review the denial of an evidentiary hearing for abuse of discretion.  United States v. Gay, 251 F.3d 950, 951 (11th Cir. 2001).

Generally, we employ a two-part test for determining whether an out-of-court identification was properly admitted.  First, we ask whether the original identification procedure was unduly suggestive.  If we conclude that it was, we then consider whether, under the totality of the circumstances, "the identification was nonetheless reliable."  United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir.

2001).  The Constitution does not impose a per se rule requiring an evidentiary hearing in every case.  Watkins v. Sowders, 449 U.S. 341, 349 (1981); United States v. Smith, 546 F.2d 1275, 1279-80 (5th Cir. 1977) (holding that "[a]n evidentiary hearing is not required where none of the critical facts are in dispute and the facts as alleged by the defendant if true would not justify the relief requested" (quotation marks omitted)).[7]

Here, Brown made no argument and presented no evidence suggesting that the techniques used by the police were "unduly suggestive."  Under these circumstances the district court did not abuse its discretion in declining to hold an evidentiary hearing.  See United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000) (no abuse of discretion in denying motion for an evidentiary hearing where underlying motion to suppress was "wholly lacking in sufficient factual allegations").  Moreover, as the government correctly observes, any error arising from purportedly improper identification evidence would be subject to harmless error analysis.  United States v. Beale, 921 F.2d 1412, 1433-34 (11th Cir. 1991).  At trial, two witnesses testified that they saw Brown at the Post Office and selected him from a photo lineup.  Those witnesses were effectively cross-examined

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

31

regarding their identifications, one telling the jury that Brown was "the closest resemblance" to the man he saw at the Post Office and the other stating that although he was not one hundred percent sure, he thought Brown was the person he observed. Given the overwhelming evidence of Brown's guilt, including Brown's confession, the recovered money orders, and the DNA samples of the victim's blood found on his jacket, any conceivable errors related to the two identifications were harmless because "there is no reasonable probability that the evidence complained of might have contributed to the conviction." See id. at 1433 (quotation marks omitted) (finding any purported identification errors harmless where the government introduced "overwhelming" evidence of the defendants' guilt).

## C.    Brady

Brown also argues, upon information and belief, that the government withheld evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), that Gaglia's husband was opposed to the imposition of the death penalty. Normally, we review the denial of a motion for a new trial based on an alleged Brady error for abuse of discretion. United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998). However, if the Brady claim is not precisely articulated to the district court, we only review it for plain error. United States v. Bender, 290 F.3d 1279,

32

1284 (11th Cir. 2002). In this case, there is no indication that the <u>Brady</u> claim was ever presented to the district court.

In <u>Booth v. Maryland</u>, 482 U.S. 496 (1987), the Supreme Court held that victim impact evidence was not admissible in the penalty phase of a capital trial. This prohibition included evidence of: 1) the personal characteristics of the victim and the emotional impact of the crimes on the victim's family; and 2) family members' opinions and characterizations of the crimes and the defendant. <u>Id.</u> at 507-09. Several years later, the Court overruled part of <u>Booth</u>, holding that the Eighth Amendment erects no <u>per</u> <u>se</u> bar against the introduction of victim impact evidence. <u>Payne v. Tennessee</u>, 501 U.S. 808, 827 (1991). The Court explicitly noted, however, that:

> [o]ur holding today is limited to the holdings of <u>Booth</u> . . . and <u>South Carolina v. Gathers</u>, 490 U.S. 805, 109 S. Ct. 2207, 104 L. Ed. 2d 876 (1989), that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. <u>Booth</u> also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case.

<u>Payne</u>, 501 U.S. at 830 n.2. Thus, the <u>Booth</u> prohibition against evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence remains good law. <u>See</u> <u>Humphries v. Ozmint</u>, 397 F.3d 206,

217 (4th Cir. 2005) (en banc) (noting that "the Payne Court did not alter Booth's holding that admitting evidence of the victims' [family members'] opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment"); United States v. Bernard, 299 F.3d 467, 480-81 (5th Cir. 2002) (finding statements from the victim's family members characterizing the defendants and offering opinions about the nature of the crime inadmissible under Booth); Hain v. Gibson, 287 F.3d 1224, 1238-39 (10th Cir. 2002) (expressly recognizing "that the portion of Booth prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in Payne and remains valid"); Parker v. Bowersox, 188 F.3d 923, 931 (8th Cir. 1999) (discussing Payne and Booth and holding that "family members of the victim may not state 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' at the penalty phase" of a capital trial).[8]

_____

[8]Most of the cases recognizing the continued validity of Booth insofar as it prohibited a victim's family member from offering an opinion as to the appropriate sentence have arisen in the context of an opinion supporting the imposition of the death penalty. Here, however, the alleged evidence apparently would have shown that a family member opposed the death penalty. At least one circuit has found that a victim's family member's belief that the death penalty should not be imposed is similarly irrelevant. See Robison v. Maynard, 829 F.2d 1501, 1504-05 (10th Cir. 1987), overruled on other grounds, Romano v. Gibson, 239 F.3d 1156, 1169 (10th Cir. 2001). In Robison, the court noted that

[a]n individual's personal opinion on how the sentencing jury should acquit its responsibility, even though supported by reasons, relates to neither the character or record of the defendant nor to the circumstances of the offense. Such

In <u>Brady</u>, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. This evidence was not material, and therefore could not violate <u>Brady</u>, because it was neither relevant nor admissible; indeed, there is no reasonable (or even remote) probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 289 (1999) (noting that, under <u>Brady</u>, failure to disclose evidence is material if there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense).

The district judge ruled that he would "not allow any witness to make a recommendation to the jury that you should take [Brown's] life or that you should spare his life. That is a direct invasion of the jury's province." That ruling is fully consonant with the Supreme Court's holdings in <u>Booth</u> and <u>Payne</u>. In short, we can discern no <u>Brady</u> violation, let alone plain error.

## D. Motion To Quash DFACS Subpoena

---

testimony, at best, would be a gossamer veil which would blur the jury's focus on the issue it must decide.

<u>Id.</u> at 1505. We agree and find it immaterial that a family member's opinion would have been offered in opposition to the death penalty, just as it would be improper if the expressed opinion supported the application of the death penalty.

35

As for this issue, Brown contends that the magistrate judge erred in quashing a subpoena Brown served upon the Liberty County Department of Child and Family Services ("DFACS") for the production of "[a]ny and all material relating to Sadie Brown and/or Roy Morgan, their living and health circumstances, and any information regarding their residence at 6724 Leroy Coffer Highway, Fleming, Georgia, 30308." The Georgia Attorney General's Office moved to quash the subpoena. The magistrate judge conducted an in camera inspection of the relevant files and quashed the subpoena, noting that "[the files] contain no information relevant to defendant's case and no information that would warrant disclosure of these typically confidential records. In fact, defendant's name is not even referenced in any of these records."

We lack jurisdiction to review the magistrate judge's order because Brown never appealed the ruling to the district court. See United States v. Brown, 342 F.3d 1245, 1246 (11th Cir. 2003); United States v. Renfro, 620 F.2d 497, 500 (5th Cir. 1980) (noting that "[t]he law is settled that appellate courts are without jurisdiction to hear appeals directly from federal magistrates").[9] Accordingly, we

_____

[9]We add that Federal Rule of Criminal Procedure 59(a), which became effective December 1, 2005, now provides that failure to object to a magistrate judge's ruling on a nondispositive matter "waives a party's right to review." Fed. R. Crim. P. 59(a). The Advisory Committee Note states that the "waiver provision is intended to establish the requirements for objecting in a district court in order to preserve appellate review of magistrate judges' decisions." Fed. R. Crim. P. 59 advisory committee's note. We need not determine what effect this new rule of criminal procedure has on this case because the rule is in complete accord with

may not consider whether the district court abused its discretion in quashing the subpoena.

**E.      Motion To Prohibit Death-Qualification Of The Jury**

Brown also claims the district court erred in denying his motion to prohibit the "death-qualification" of the jury, contending that his rights were violated by excluding those jurors who could not be impartial in the penalty phase, but who could have been qualified to hear the guilt-innocence phase.[10]  We review this question of law de novo.  See United States v. Murrell, 368 F.3d 1283, 1285 (11th Cir. 2004).

Brown contends that the magistrate judge recommended denying the motion and that the recommendation was adopted by the district judge.  However, a review of the record reveals that the magistrate judge denied the motion outright and that Brown did not appeal that ruling to the district judge.  Thus, we are without power to consider this argument.  See Brown, 342 F.3d at 1246.

Nevertheless, even if the issue were properly presented to us, we would

our own circuit case law, which clearly prohibits us from considering Brown's argument on appeal.

[10]Death-qualification is the process by which jurors in a capital case are screened, prior to the guilt-innocence phase, to ensure that none has an opposition to the death penalty so strong that it would prevent or substantially impair their performance as jurors in the sentencing phase. A juror who could never vote for the death penalty, regardless of the court's instructions, or a juror who would automatically vote for death in every case, is removed for cause.  See Morgan v. Illinois, 504 U.S. 719, 728-29 (1992).

readily reject the argument on the merits. In <u>Lockhart v. McCree</u>, 476 U.S. 162 (1986), the Supreme Court held the Constitution does not "prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial." <u>Id.</u> at 165. Thus, Brown's claim must fail; the district court properly death-qualified the jury before the guilt phase of the trial.

**F.    Motion for Bifurcated Voir Dire**

On this issue, Brown says the district court erred by denying his motion to bifurcate voir dire. Essentially, he sought an opportunity first to question jurors prior to the guilt-innocence stage of the trial, and then a second opportunity for voir dire before the penalty stage of the trial. Brown readily concedes that the natural consequence of this practice would be that the jury determining his guilt might not be the same one to determine his sentence. This issue is closely related to Brown's prior suggestion, that the jury should not have been death-qualified because qualification eliminates some jurors who, while unqualified to decide his sentence, would plainly have been qualified to determine his guilt or innocence. This is a question of law and again we review it <u>de</u> <u>novo</u>. <u>See</u> <u>Murrell</u>, 368 F.3d at 1285.

Although the government appears to concede that this issue was properly preserved, a review of the record again reveals that the magistrate judge denied the motion for bifurcated voir dire and that Brown did not appeal the ruling to the district judge. Thus, we have no jurisdiction to consider the ruling on appeal. See Brown, 342 F.3d at 1246. But, even if the parties are correct that the issue has been properly presented, Brown's argument fails on the merits.

First, the Federal Death Penalty Act requires, except in four circumstances that are not relevant here, that the sentencing hearing "shall be conducted before the jury that determined the defendant's guilt." 18 U.S.C. § 3593(b)(1). Thus, it would have been statutorily impermissible for the district judge to use one set of jurors for the guilt phase and then a different group for the penalty phase. See United States v. Williams, 400 F.3d 277, 281 (5th Cir. 2005).

Second, Brown contends that the use of a death-qualified jury during the guilt-innocence stage violates his Eighth Amendment and due process rights by subjecting him to a conviction-prone jury. Constitutional challenges to the use of a death-qualified jury in the guilt-innocence portion of the trial have been soundly and repeatedly rejected. See, e.g., Lockhart, 476 U.S. at 176-84; Williams, 400 F.3d at 281 (noting that "constitutional challenges by defendants to unitary capital jury procedures have failed"). Again, in Lockhart, the Supreme Court held that the

39

use of a death-qualified jury during the guilt-innocence stage neither deprives a defendant of his Sixth Amendment right to a jury drawn from a representative cross section of the community nor his right to an "impartial" jury. The Supreme Court flatly rejected the claim that excluding jurors from the guilt-innocence phase who could not be impartial during the punishment phase resulted in a jury "slanted" in favor of conviction. 476 U.S. at 177-78. Brown provides no rationale for why the identical argument would be any more persuasive if considered under the rubric of the Eighth Amendment, and he offers no case law in support of his position. Thus, even if the question were properly presented, we would be constrained to reject it.

## G. Improper Statements During Death-Qualification

Brown also says the district judge improperly told jurors during voir dire that the death sentence would be appropriate <u>unless</u> there were mitigating factors weighing in favor of a life sentence. Furthermore, Brown urges that the district court inappropriately indicated to jurors during voir dire that they <u>may</u> consider mitigating factors (as opposed to telling them they <u>had</u> to consider mitigating factors). Brown did not object to these questions during voir dire, and we therefore review this issue only for plain error. <u>See</u> <u>United States v. Massey</u>, 89 F.3d 1433, 1442 (11th Cir. 1996) (failure to object to jury instructions reviewed for plain

error).  Under plain error review, we may not correct an error the defendant failed to raise in the district court unless there is: "(1) error, (2) that is plain, and (3) that affects substantial rights."  United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (quotation marks omitted).  If all three conditions are met, we may then exercise our discretion to notice a forfeited error, but only if "(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (quotation marks omitted).

The district court conducted individual voir dire with potential jurors in an effort to "death qualify" the panel.  In Morgan v. Illinois, 504 U.S. 719 (1992), the Supreme Court reiterated that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Id. at 728 (quotation marks and alterations omitted).  A juror who could never vote for capital punishment, regardless of the court's instructions, or a juror who would automatically vote for the death penalty in every case, should be stricken for cause.  Id. at 728-29.

The district court conducted the necessary voir dire in this case, excusing for cause those jurors whose views would prevent or substantially impair their

41

performance, particularly those who had predetermined their death penalty vote. Brown complains that in the process of doing so, the district judge misstated the law, implying to jurors that the death penalty was the appropriate punishment unless the mitigating factors outweighed the aggravating factors.  Brown provides several examples of this claimed error that occurred during the questioning of panel members who were eventually placed on the jury, the most egregious of which were:

> Question posed to venireman Little: If you decide that there is sufficient mitigating evidence, mitigating meaning less, or something that lessens the impact, could you vote for life imprisonment without benefit of parole?

> Question posed to venirewoman Brewer: And if you were convinced that there were mitigating circumstances that made life imprisonment without benefit of parole the more appropriate sentence, could you vote for that?

Brown maintains that the same error occurred with respect to seven other members of the jury, although the two examples noted above are the most explicit.

The Federal Death Penalty Act makes clear that a jury must consider both aggravating and mitigating factors at the penalty stage of the trial.  But, as the statute makes abundantly clear, a jury need not find a mitigating factor in order to impose a non-death sentence:

> [T]he jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or

> factors found to exist to justify a sentence of death, or, <u>in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death</u>.

18 U.S.C. § 3593(e) (emphasis added). The district judge's questions during voir dire were not to the contrary. The court never told a venireperson that he could impose a life sentence if and only if he found a mitigating circumstance justifying a non-death sentence. Rather, the trial judge simply asked, as he was required to do, whether the prospective juror could impose a life sentence if he felt that was the punishment warranted.

The district judge's questions may have been inartfully worded. However, there are several large, inferential leaps between the district judge's question asking whether a juror <u>could</u> impose a life sentence and the juror's conclusion that he would be permitted to impose a life sentence <u>if and only if</u> he found the existence of a mitigating factor. Moreover, any juror who actually drew that attenuated conclusion -- and there is no evidence that any did -- was later given explicit jury instructions that correctly stated the law. There was no error, plain or otherwise.

But, even if there were plain error, it did not affect Brown's substantial rights because the district judge explicitly corrected the purported error when he gave the jury the following instruction before they began their deliberations:

you are to determine whether the aggravating factors found to exist sufficiently outweigh the mitigating factors; or, in the absence of mitigating factors whether the aggravating factors alone are sufficient to support a finding that a sentence of death be imposed[. R]egardless of your findings with respect to aggravating and mitigating factors, however, you individually or collectively are never required to recommend a sentence of death.

This instruction plainly told the jury that it could impose a life sentence even if it found no mitigating factors and explicitly made clear that a jury is never required to impose a death sentence. "A curative instruction purges the taint of a prejudicial remark because a jury is presumed to follow jury instructions." United States v. Simon, 964 F.2d 1082, 1087 (11th Cir. 1992) (quotation marks omitted). See also United States v. Noone, 913 F.2d 20, 35 (1st Cir. 1990) (finding that a misleading question in voir dire was cured by proper jury instructions and therefore did not result in "manifest injustice" under a plain error analysis).[11]

_____

[11]Similarly, we find unpersuasive Brown's argument that the trial judge's questions prevented him from obtaining a properly death-qualified jury because the questions gave him no guarantee that the jurors selected would be able to vote for life imprisonment absent mitigating factors. The death-qualification process is designed to weed out only those jurors whose personal beliefs would prevent or substantially impair the performance of their duties as jurors in accordance with the court's instructions and oath. Morgan, 504 U.S. at 728. The trial judge has substantial discretion in conducting this process, and there are no set questions that must be asked. See Wainwright v. Witt, 469 U.S. 412, 424 (1985) (noting that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism"). Brown has not established that any particular juror lacked impartiality based upon a potential misunderstanding of that juror's province to impose a life-sentence even in the absence of mitigating factors. Id. at 423 (noting that the burden of showing impartiality is on the party wishing to exclude a juror). Thus, we find no error. See Ramsey v. Bowersox, 149 F.3d 749, 757 (8th Cir. 1998) (rejecting a challenge to voir dire where the trial judge addressed the "crucial" disqualification issue of whether a juror would automatically vote for or against the death penalty, thus "reasonably assur[ing]" the defendant the chance to detect a juror's potential

44

## H.  Juror Fahey

Brown also cites as error the district court's decision to dismiss one juror, Kristin Fahey, for cause.  We review a district court's decision to strike a prospective juror for cause for abuse of discretion.  United States v. Abraham, 386 F.3d 1033, 1035 (11th Cir. 2004).

Juror Fahey was struck for cause during the death-qualification stage of voir dire.  The district judge and counsel for both sides asked her numerous questions concerning her ability to impose the death penalty.  She struggled with her answers, saying that generally she was opposed to the death penalty, but that there might be circumstances where she could vote for a death sentence.  She indicated she would want to listen to all the facts and had not predetermined whether she would vote for or against the death penalty.

However, toward the end of the inquiry, she had the following exchange with the prosecutor:

> [A.U.S.A.] Newman:  Ms. Fahey, would you make your decision on the ultimate punishment in this case based on your internal set of values or on what the law is that [the judge] will give you to apply, which by your oath as a juror you would be sworn to follow?

> Juror: I believe I would probably make the decision based upon my own internal values.

---

bias).

45

Mr. Newnan: Even if those might conflict and be different than what [the judge] is telling the jury to apply?

Juror: Yes.

The district judge acknowledged that this was a very close call.

> But the last question when she said - - and I think she's altogether candid - - I think we all agree, one, that here is a juror that is struggling. She is, by anybody's judgment, also at the point where she will say under no circumstances would she impose the death sentence. But she is not prepared to go quite that far, because she can imagine certain circumstances that she would go. But then she says, again in total candor, that I would have to impose my standards and I could not necessarily follow the law or the instructions.

The Supreme Court made it clear in Adams v. Texas, 448 U.S. 38 (1980), that it is proper to strike for cause those potential jurors whose views on capital punishment "would prevent or substantially impair the performance of [their] duties as . . . juror[s] in accordance with [the court's] instructions and . . . oath." Id. at 45. See also id. ("[t]he State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court"); id. at 48 (noting that the State could "exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths") (emphasis added). Determining when a juror will reject the law as given by the trial court in favor of her own belief system is a difficult undertaking, but despite the difficulty inherent in the task and that the record will

46

not always make bias "unmistakably clear," "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Wainwright v. Witt, 469 U.S. 412, 425-26 (1985). Thus, "deference must be paid to the trial judge who sees and hears the juror." Id. at 426.

Based on Fahey's equivocating answers and her ultimate conclusion that she would vote based on her own internal values and not on the instructed law, the district court did not abuse its discretion in striking her for cause. Cf. Stewart v. Dugger, 877 F.2d 851, 855 (11th Cir. 1989) (finding no Witherspoon violation where a potential juror, although indicating a strong aversion to the death penalty, admitted that after hearing the facts he could "maybe" consider imposing death).

I.      Statement To Juror Regarding Guilty Plea

Brown also claims that he is entitled to a new trial because the district judge inadvertently told a prospective juror, who was eventually seated on the jury, that Brown had pled guilty. Neither party objected and, therefore, we review the issue for plain error. See United States v. Massey, 89 F.3d 1433, 1442 (11th Cir. 1996) (failure to object to jury instructions reviewed for plain error).

While death-qualifying the potential jurors, the transcript indicates that the following colloquy took place between the trial court and a woman who was

47

eventually seated as a juror:

> The Court: Now, you understand that the defendant has entered a plea of guilty.

> Juror: Yes, Your honor.

> The Court: The law presumes him to be not guilty. You understand that.

> Juror: I do.

> The Court: And the responsibility is on the government to convince a fair and impartial jury, and each member of it, that he is guilty of the offense charged, and his guilt must be demonstrated beyond a reasonable doubt. You understand that.

> Juror: I do.

Clearly, the district judge's statement that Brown had entered a guilty plea was either a slip of the tongue or a transcription error. It was immediately followed by statements indicating that the law presumes the defendant not guilty and that the government has the burden of proving his guilt beyond a reasonable doubt. The district judge later instructed the jury that the government had the burden of overcoming the presumption of innocence by proof that removes all reasonable doubt and specifically told the jury that "it will be your duty to decide whether the government has proved beyond a reasonable doubt the specific facts necessary to find the defendant guilty of the crime or crimes charged in the indictment."

If the district judge did, in fact, tell the juror that Brown had entered a guilty plea, there was error and it was plain. However, we have some difficulty believing so obvious and egregious an error would have occurred without immediate objection from both the defendant and the government. Because there was no objection, a transcription error may be the more plausible explanation.

But, even if the district judge did make a slip of the tongue, it did not affect Brown's substantial rights because it occurred well before jury deliberations and was explicitly corrected during the court's jury instructions. See United States v. DeMasi, 40 F.3d 1306, 1321-22 (1st Cir. 1994) (noting that "the challenged statements, though problematic, are isolated snippets culled from over thirty pages of generally cautious, careful, and correct instructions. At most, the statements were inadvert slips of the tongue with limited prejudicial force."); United States v. McCue, 643 F.2d 394, 396 (6th Cir. 1981) (no reversible error where judge inadvertently said the word "convict" when he meant to say "acquit" in the course of otherwise correct jury instructions).

## J.    Hearsay

Brown also objects to the introduction of three statements received in evidence at the trial on grounds that they were hearsay and violated his rights under the Confrontation Clause of the Sixth Amendment.

49

First, Brown objects to the testimony of Darlene Washington, which was offered at the guilt-innocence stage of the trial. Washington testified that she was in the Post Office on the morning of the robbery and overhead Brown tell Gaglia that his name was "Jason." Brown did not object to this testimony at trial, so we review it for plain error. See United States v. Campbell, 223 F.3d 1286, 1288 (11th Cir. 2000). In the first place, Brown's statement of his name was not hearsay because it was the statement of a party-opponent. See Fed. R. Evid. 801(d)(2)(A); United States v. Munoz, 16 F.3d 1116, 1120 (11th Cir. 1994) (noting that "a statement is not hearsay if it is the statement of the party against whom it is offered"). Moreover, admission of the statement did not violate the Confrontation Clause. See United States v. Zizzo, 120 F.3d 1338, 1354 (7th Cir. 1997); United States v. Moran, 759 F.2d 777, 786 (9th Cir. 1985); United States v. Rios Ruiz, 579 F.2d 670, 676-77 (1st Cir. 1978); see also 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 802.05[3][d] at 802-25 (2d ed. 2005) (noting that "a party cannot seriously claim that his or her own statement should be excluded because it was not made under oath or subject to cross-examination").

Next, Brown objects to Dietrechusn Davis's testimony, which was also offered by the government at the guilt-innocence stage. Davis testified that Sadie Brown (Brown's mother) received a phone call and said "Meier, where you at?

50

Meier, you didn't kill that lady, no." Davis testified that Sadie then started crying, at which point he left. The defendant objected at trial, alleging hearsay and that "I can't cross examine her." We review a district court's hearsay ruling for abuse of discretion. United States v. De La Mata, 266 F.3d 1275, 1300-01 (11th Cir. 2001). The district judge overruled the hearsay objection. Although his reasons for doing so are not entirely clear from the record, the statement was an excited utterance and thus subject to a hearsay exception. See Fed. R. Evid. 803(2) (providing a hearsay exception for "[a] statement relating to a startling event or condition made while the declarant was under stress of excitement caused by the event or condition"). The district court did not abuse its discretion in ruling that the statement was admissible.

Brown also claims that Davis's testimony violated his confrontation clause rights and was impermissibly admitted in contravention of the Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36 (2004). In Crawford, the Supreme Court held that testimonial evidence from an absent witness may be admitted only when the witness is unavailable and the defendant had a prior opportunity to cross-examine the declarant. Id. at 68. The Crawford rule applies only to testimonial evidence. Id.; United States v. Cantellano, 430 F.3d 1142, 1145 (11th Cir. 2005) (noting that non-testimonial evidence "is not subject to

confrontation").

Justice Scalia, writing for the majority in Crawford, offered some examples of what the Court had in mind when it used the term "testimonial" evidence:

ex parte in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Crawford, 541 U.S. at 51-52 (quotation marks, citations and alterations omitted). The Court further noted that a historical version of Webster's Dictionary defines "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Id. at 51 (citing 1 N. Webster, An American Dictionary of the English Language (1828)) (alteration in original).

We need not divine any additional definition of "testimonial" evidence to conclude that the private telephone conversation between mother and son, which occurred while Sadie Brown was sitting at her dining room table with only her family members present, was not testimonial.  See id. (noting that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"); United

52

States v. Hendricks, 395 F.3d 173, 181 (3d Cir. 2005) (surreptitiously monitored conversations not testimonial);  Horton v. Allen, 370 F.3d 75, 83-84 (1st Cir. 2004) (holding that a statement from a conversation, admitted under the state-of-mind exception to the hearsay rule, was non-testimonial because it was private, was not made under examination, was not contained in a formal document, and was not made "under circumstances in which an objective person would reasonably believe that the statement would be available for use at a later trial" (quotation marks omitted)).  The phone conversation Davis overheard obviously was not made under examination, was not transcribed in a formal document, and was not made under circumstances leading an objective person to reasonably believe the statement would be available for use at a later trial.  Thus, it is not testimonial and its admission is not barred by Crawford.

Finally, Brown objects to the testimony of Catherine Webb, Gaglia's sister, which was offered at the penalty phase of the trial.  Webb testified about how Gaglia's death affected Gaglia's husband and children.  She did not testify about any direct statements any other family member made; instead, she testified as to how those people were affected by Gaglia's death.  Thus, for example, she said that one of Gaglia's sons "felt under his emotional state of mind that he could not [go to college] at this time.  He could not concentrate to go onto college."  Webb stated

53

that "I just spoke with [Gaglia's husband] just a few minutes ago. He could not appear. His emotional state, he is going through therapy. . . And he knew that under the advise of his therapist, and a counseling group that he had gone to with other family members that have lost closed [sic] loved ones, that he could not, he could not manage to go through this court hearing." There was no objection to the admission of Webb's testimony, so we review it for plain error. See United States v. Campbell, 223 F.3d 1286, 1288 (11th Cir. 2000).

First, we do not believe that any of Webb's testimony was hearsay. Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Webb's testimony did not include statements by Gaglia's husband or children. Rather, Webb simply offered her impression of how they were coping with Gaglia's death, which was not hearsay.

Moreover, even if the statements could be characterized as hearsay, the Federal Rules of Evidence do not apply during the penalty phase of a federal capital trial. See 18 U.S.C. § 3593(c) ("Information is admissible [during the penalty phase] regardless of its admissibility under the rules governing admission

54

of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury"); United States v. Johnson, 223 F.3d 665, 674 (7th Cir. 2000) ("[T]he Federal Death Penalty statute does not require evidence of aggravating or mitigating factors be admissible under the rules of evidence."). Cf. Chandler v. Moore, 240 F.3d 907, 918 (11th Cir. 2001) (holding that hearsay is admissible at a state capital sentencing hearing as long as the state statute allows the defendant the opportunity to rebut any hearsay information). Brown has not shown that Webb's testimony was unfairly prejudicial, that it confused the issues, or that it misled the jury. Moreover, he had every opportunity to rebut the evidence. Thus, there was no statutory error.

Brown also says that admission of Webb's testimony violated Crawford. We need not determine whether Crawford applies to the penalty phase of a federal capital trial because, even if it did, the challenged evidence is not testimonial. The evidence provided by Webb was based on her observations of Gaglia's family members. To the extent that any of those people made statements about which Webb then testified (again, we can discern no "statements," at least to the extent that term is defined in the hearsay context), they were not testimonial in nature. They were made by one grieving family member to another. They were not made

in the context of an examination, were not recorded in a formal document, and were not made under circumstances that would lead a reasonable person to believe they would be later used at trial. Moreover, there is no evidence to show that the family members were unavailable; to the extent Brown wished to do so, he could have called any of them as a witness. Thus, because the statements were not testimonial, we need not address whether Crawford applies in the penalty phase of a federal capital trial.[12]

_____

[12]We have held that Crawford does not apply in the context of non-capital sentencing. See United States v. Cantellano, 430 F.3d 1142, 1146 (11th Cir. 2005). However, death is different, and we have held, in the state habeas context, that the constitutional right to cross-examine witnesses applies to capital sentencing hearings. Proffitt v. Wainwright, 685 F.2d 1227, 1254-55 (11th Cir. 1982) (noting that the right of cross-examination applies at capital sentencing hearings and that the right of cross-examination is "implicit" in the Sixth Amendment right of confrontation); see also Chandler, 240 F.3d at 918 (holding that in order to comply with the Sixth Amendment, a state capital sentencing statute must allow the defendant the opportunity to rebut hearsay evidence). Our view is, however, far from universally accepted. See, e.g., United States v. Higgs, 353 F.3d 281, 324 (4th Cir. 2003) (noting that "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding" and citing our decision in Proffitt as being contrary to Fourth Circuit law); Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002) (citing Williams v. New York, 337 U.S. 241 (1949), for the proposition that the Confrontation Clause does not apply to capital sentencing and noting that the Supreme Court "has never questioned the precise holding of" Williams). District courts that have considered this question in federal capital cases post-Crawford have done so in the context of a bifurcated penalty phase (three stages all together -- a guilt-innocence phase, a death-eligibility phase, and a penalty phase) and have held that the Confrontation Clause and Crawford apply in the "eligibility" portion of the penalty phase (where the jury determines whether the defendant is statutorily eligible for the death penalty) but not in the "selection" portion of the penalty phase (where the jury determines whether it will actually impose the death penalty). See United States v. Johnson, 378 F. Supp. 2d 1051, 1059-62 (N.D. Iowa 2005) (holding that the Confrontation Clause does not apply to the penalty phase after assuming, without deciding, that it applied at the eligibility phase); United States v. Bodkins, No. 4:04CR70083, 2005 WL 1118158, at *4-5 (W.D. Va. May 11, 2005); United States v. Jordan, 357 F. Supp. 2d 889, 901-904 (E.D. Va. 2005). We do not decide whether Crawford applies at the penalty phase of a federal capital trial precisely because the challenged evidence offered in this case was so clearly non-testimonial. Moreover, we offer no opinion on the propriety of trifurcating a federal capital trial so that the

**K.     Crime Scene Photographs**

Brown also cites as an evidential mistake that the district court admitted color crime-scene photographs of Gaglia's body.  Again, we review the trial court's evidentiary rulings for an abuse of discretion.  United States v. Ruiz, 253 F.3d 634, 639-40 (11th Cir. 2001).  In reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.  United States v. Jernigan, 341 F.3d 1273, 1284 (11th Cir. 2003).

The trial court allowed the admission of six photographs investigators took of Gaglia's body as it appeared at the crime scene.  The photos were admitted at the guilt stage but were not republished at the penalty phase.  Brown moved to suppress the photographs before trial, and the district court denied his motion subject to renewal at trial when relevance would be more apparent.  Brown renewed his objection at trial.

The evidence is undoubtably relevant; the photographs make facts of consequence, such as Gaglia's death and the number and nature of stab wounds to her body, more probable than they would be without the evidence.  See Fed. R. Evid. 401; United States v. DeParias, 805 F.2d 1447, 1453 (11th Cir. 1986)

_____

penalty phase would be conducted in two distinct parts.

(holding that "[p]hotographs of homicide victims are relevant in showing the identity of the victim, the manner of death, the murder weapon, or any other element of the crime"), overruled on other grounds by United States v. Kaplan, 171 F.3d 1351, 1356-57 (11th Cir. 1999) (en banc). Moreover, at the penalty phase of the trial, the photographs were relevant in determining the existence of one of the alleged statutory aggravating factors: whether Brown "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6).

However, evidence that is otherwise relevant "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Brown says that the pictures were unfairly prejudicial because the condition of the body as displayed in the photographs was not the same as the condition of the body after he committed the murder because the body was moved when rescuers attempted to revive Gaglia. Moreover, Brown contends that resuscitation efforts increased the amount of blood on and around the body, making the attack look more vicious than it really was. We are unpersuaded.

In DeParias, we rejected an argument that admitting photographs of a "badly decomposed corpse" was an abuse of discretion under Rule 403. 805 F.2d at 1453-54. Although we did not specifically address an argument that the changed state of

the body rendered the photos unfairly prejudicial, we implicitly rejected such a contention. The changes in appearance that accompany decomposition are significantly greater, and more gruesome, than those that were present in this case. Although there may have been slightly more blood shown in the photographs than there was when Brown left the scene, that is a direct and natural consequence of his decision to repeatedly stab the victim. There was no unfair prejudice.

Brown also argues that the photos were unnecessary, cumulative and therefore unfairly prejudicial because the government introduced other evidence, such as the testimony of the medical examiner, that established Gaglia's cause of death. We explicitly rejected this argument in DeParias and find it no more compelling here. See id. at 1454 (noting that "Rule 403 does not mandate exclusion merely because some overlap exists between the photographs and other evidence. The admission of these photographs in addition to the testimony of the coroner hardly constitutes such a needless accumulation of evidence as to amount to an abuse of discretion" (citation omitted)).

Finally, even if this amounted to an abuse of discretion, it would be harmless error at both the guilt and penalty phases. Brown directs us to Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003), a case where the Tenth Circuit held that crime-scene photographs introduced at the penalty phase of a state capital trial rendered

the proceeding fundamentally unfair because they were only minimally relevant to the "heinous, atrocious, or cruel" aggravating factor. Id. at 1227-28. In Spears, which was decided under Oklahoma law, whether a crime was heinous, atrocious, or cruel depended on whether the defendant had inflicted unnecessary suffering while the victim was still conscious. See id. at 1226-27. The evidence in Spears showed that only two of the fifty to sixty stab wounds were inflicted peri-mortem. Id. at 1228. Thus, the relevance of the photographs was limited in that case. The court found that, in light of the limited relevance, the gruesome depictions of the body, which included exposed intestines and large gash wounds, were unduly prejudicial. Id. at 1227-28.

Our case is different from Spears in several important respects. First, we are proceeding under Federal Rule of Evidence 403. Second, the pictures here were relevant to both guilt and penalty considerations. Moreover, unlike Oklahoma law, the federal law does not limit the "heinous, cruel, or depraved" aggravating circumstance to abuse inflicted while the victim was alive, so each of the stab wounds in this case is individually relevant. Finally, the pictures themselves were not nearly as gruesome as those in Spears, significantly lessening their prejudicial impact. Thus, even if this were error -- and we find none -- it would be harmless because it did not result in the type of "fundamentally unfair" proceeding that

60

infected the <u>Spears</u> case.

**L.      Denial Of Funds For Two Requested Experts**

Brown also claims the district court erred in denying his request for funds to hire a forensic social worker and a future dangerousness expert.  The magistrate judge denied the application for funds for the forensic social worker because he concluded that expert would do work duplicative of the work being performed by other court-funded experts (a mitigation specialist and psychologist) and denied funds for the future dangerousness expert because that testimony could be presented by lay witnesses.  The district court agreed.  We review the district court's denial of funds for abuse of discretion.  <u>See</u> <u>In re Lindsey</u>, 875 F.2d 1502, 1507 n.4 (11th Cir. 1989); <u>accord</u> <u>Riley v. Dretke</u>, 362 F.3d 302, 308 (5th Cir. 2004).

The district court may order funds for "investigative, expert, or other services" that "are reasonably necessary for the representation" of a defendant charged with a crime punishable by death.  21 U.S.C. § 848(q)(9).  Although we have not analyzed the term "reasonably necessary," the Fifth Circuit has held that the statute requires the defendant to demonstrate a "substantial need" for the requested assistance.  <u>Riley</u>, 362 F.3d at 307.

In his motion for funds for a forensic social worker, Brown argued that this

61

expert was necessary to: (1) diagnose and make recommendations about mental status; (2) provide a comprehensive social history interpreting Brown's environment and social functioning; (3) conduct comprehensive clinical interviews; (4) conduct diagnostic interviews to tell the Defendant's story; (5) provide counseling to Brown and his family; and (6) serve as an expert witness. The motion included an affidavit from David I. Bruck, who serves as Federal Death Penalty Resource Counsel. Bruck conceded that there is some overlap between the roles of a mitigation specialist -- for whom the court had already approved funds -- and a forensic social worker. He noted that while some mitigation specialists could testify as experts, "it is a common practice for mitigation specialists to work as investigators in support of the work of forensic social workers as well as other mental health professionals such as psychologists and psychiatrists."

The district court concluded that the work of the forensic social worker would be unnecessary and duplicative because it had already approved funding both for a mitigation specialist and a psychologist. Brown says, nevertheless, that without a forensic social worker, he was unable to present coherent testimony relating to the background, upbringing, and social context of his life. That argument is contradicted by the record. At the penalty phase, Brown presented

fourteen witnesses who testified about Brown and his childhood. Those witnesses described the deplorable conditions under which Brown was raised, noting that there were frequent fights in his home, that his parents used drugs, that his father left the home after shooting his stepson when Brown was seven, that a child died at Brown's home after drowning in a septic tank, and that the police were frequently called to break up fights, shootings, and stabbings. Brown offers no explanation for why neither his court-funded mitigation specialist nor his court-funded psychologist was called as an expert, nor why they could not offer additional evidence on precisely these points. Quite simply, the district court did not abuse its discretion in denying funds for the forensic social worker.

The same result applies to the denial of funds for a future dangerousness expert. The district court found that Brown could present lay testimony to establish that he would not be a danger to society if sentenced to a life term, and that is exactly what happened at the trial. Brown presented the testimony of the Assistant Jail Administrator for Liberty County, who said that Brown had been a stellar inmate in the past, had no disciplinary problems while in jail, had been appointed a jail trustee (a position reserved for inmates with a positive attitude and a good disposition), had served admirably as a jail trustee, had never engaged in acts of violence while in jail, and had actively participated in church and choir

63

activities while in jail. Additionally, he presented the testimony of the Assistant Jail Administrator for Chatham County, who likewise testified that Brown had not engaged in any acts of violence or caused any disciplinary problems while he was housed in the Chatham County Jail.

In Skipper v. South Carolina, 476 U.S. 1 (1986), the Supreme Court held that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." Id. at 5. The Supreme Court ruled that the trial court should have permitted the testimony of former jailers who would have opined on the defendant's good jail behavior, the very type of evidence that was introduced in this case. The Skipper Court said nothing about the need for expert testimony on this subject, and, in light of the ample lay testimony presented on this topic, and the ease with which the jury could understand it, the district court did not abuse its discretion in denying funds for a future dangerousness expert.

Brown also raises a non-statutory argument concerning the denial of funds, claiming that he was denied his rights under Ake v. Oklahoma, 470 U.S. 68 (1985). In Ake, the Supreme Court held that "when a defendant demonstrates . . . that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will

conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Id. at 83. We have not extended Ake to non-psychiatric experts, see Conklin v. Schofield, 366 F.3d 1191, 1206 (11th Cir. 2004) (assuming for the sake of argument that Ake applies to non-psychiatric experts, and denying the claim), but, if we were to assume that Ake applies, Brown would have to show that (1) he made a timely request for the expert assistance, (2) it was unreasonable for the trial court to deny the request, and (3) the denial rendered the trial "fundamentally unfair." Id. at 1206.

Under an Ake analysis, Brown fails on both the second and third prongs. As noted above, under the circumstances of this case, the trial court's decision was entirely reasonable. See id. at 1208 (noting that reasonableness is determined by the sufficiency of the defendant's explanation for why he needed the expert assistance). Moreover, Brown fails on the final prong because he cannot show that the alleged Ake error had "substantial and injurious effect or influence in determining the jury's verdict." Id. at 1209 (quotation marks omitted). Brown presented copious and coherent testimony regarding both his social history and his future dangerousness. We readily conclude that the district court committed neither statutory nor constitutional error in denying the requested funds.

**M.    Constitutionality Of The Federal Death Penalty Act**

65

Brown also claims that the Federal Death Penalty Act ("FDPA") is unconstitutional because it does not require the prosecutor to charge the necessary aggravating factors in the indictment. The district court found the statute constitutional. We review the constitutionality of a statute de novo. United States v. Ballinger, 395 F.3d 1218, 1225 (11th Cir. 2005) (en banc).

Once a defendant has been found guilty of a death-eligible crime, there are several findings a jury must make before it may consider the death penalty. First, the statute says that it must find the existence of one of four statutorily proscribed mens rea requirements. See 18 U.S.C. § 3591(a)(2).[13] Next, if the mens rea requirement is satisfied, the jury also must find the existence of one of sixteen statutorily proscribed aggravating factors. See 18 U.S.C. § 3592(c). Only after

---

[13]To be death eligible, the jury must find that the defendant:

(A) intentionally killed the victim;
(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2).

those considerations have been satisfied is a defendant death-eligible.[14] Then, the jury must decide whether all of the statutory and non-statutory[15] aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death, or, if there are no mitigating factors, whether the aggravating factors alone are sufficient to justify death. 18 U.S.C. § 3593(e).

The original indictment in this case charged Brown with committing three federal crimes: murder within the federal jurisdiction (18 U.S.C. § 1111); murder of a federal employee (18 U.S.C. § 1114); and robbery of federal property (18 U.S.C. § 2114). It then went on to list six special findings. In those special findings, the grand jury charged that Brown: 1) was eighteen years of age or older at the time of the offenses; 2) intentionally killed the victim; 3) intentionally inflicted serious bodily injury that resulted in the victim's death; 4) intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a result of such act or acts; 5) intentionally and specifically engaged in one or more acts of violence,

[14]Additionally, the statute provides that no person may be sentenced to death who was less than eighteen years of age at the time of the offense. 18 U.S.C. § 3591(a).

[15]After listing sixteen specific aggravating factors, the statute provides that the jury "may consider whether any other aggravating factor for which notice has been given exists." 18 U.S.C. § 3592(c). These "other" aggravating factors are generally referred to as "non-statutory" factors.

knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and the victim died as a direct result of such act or acts; and 6) committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim. Special findings two through five correspond to the mens rea requirements of 18 U.S.C. § 3591(a)(2), and special finding number six corresponds to one of the sixteen statutory aggravating factors, found at 18 U.S.C. § 3592(c)(6). In a superseding indictment, the grand jury made one additional special finding, charging that Brown committed the offenses in the expectation of the receipt of something of pecuniary value, which corresponds to another of the sixteen statutory aggravating factors, found at 18 U.S.C. § 3592(c)(8).

Relying on the Supreme Court's decision in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), Brown argues that the FDPA is facially unconstitutional because it does not <u>require</u> the government to allege the necessary aggravating factors in the indictment. This argument was rejected by the district court.

In <u>Ring</u>, the Court held that an aggravating factor necessary for imposition of the death penalty has to be found by a jury; it cannot be determined by the sentencing judge. 536 U.S. at 609. Although <u>Ring</u> was a Sixth Amendment case,

other circuits have unanimously found that the holding applies with equal force in the context of a Fifth Amendment challenge to the lack of statutory aggravating factors in an indictment charging a death-eligible crime under the FDPA. See United States v. Allen, 406 F.3d 940, 942-43 (8th Cir. 2005) (en banc); United States v. Robinson, 367 F.3d 278, 284 (5th Cir. 2004); United States v. Higgs, 353 F.3d 281, 297-98 (4th Cir. 2003). Accord United States v. LeCroy, --- F.3d ---, No. 04-15597, slip op. at 9 (11th Cir. March 2, 2006) (assuming without deciding that at least one statutory aggravating factor must be included in the indictment). We agree with our sister circuits that at least one statutory aggravating factor, which is necessary to elevate the maximum sentence from life imprisonment to death, must be charged in the indictment.

Here, Brown concedes that all of the relevant statutory aggravating factors were alleged in the indictment. Nevertheless, he argues that the FDPA is facially unconstitutional anyway because it does not require those factors to be alleged in the indictment. Essentially, Brown argues that the grand jury cannot "fix" the defect in the statute by simply alleging the aggravating factors in the indictment; according to Brown, only Congress can cure the deficiency in the law. We recently rejected that argument in LeCroy. Id. at 10-11.

"A facial challenge to a legislative Act is, of course, the most difficult

challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). As the Fifth Circuit recently held,

> [t]he FDPA is not facially unconstitutional under the Indictment Clause. Although [the defendant] is correct to point out that nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment, he fails to note that there is nothing in that law inhibiting such a charge. The government can easily comply with both its constitutional obligations (by first going to the grand jury) and its statutory obligations (by later filing a § 3593(a) notice of intention to seek the death penalty). As a result, the statute is not facially unconstitutional.

Robinson, 367 F.3d at 290. Other circuits have rejected facial challenges to the FDPA on similar grounds. Allen, 406 F.3d at 949; United States v. Barnette, 390 F.3d 775, 788-90 (4th Cir. 2004), vacated on other grounds, 126 S. Ct. 92 (2005). The FDPA is not facially unconstitutional. Nothing prohibits the government from presenting aggravating factors to a grand jury and then, if appropriate, charging those aggravating factors in the indictment. Indeed, that is precisely what the government did in this case.

Brown also argues that non-statutory aggravating factors must be alleged in the indictment. Here, the government provided notice (albeit not in the indictment) of its intent to seek five non-statutory factors: (1) the defendant caused injury, harm, and loss to Gaglia and her family; (2) the manner of the defendant's

70

commission of the offense was intended to reduce the likelihood of detection; (3) Gaglia was an employee of the U.S. Postal Service, killed in the performance of her official duty; (4) the defendant has committed an array of other criminal acts, some but not all of which have resulted in conviction; and (5) repeated prior efforts to rehabilitate and deter the defendant from criminal conduct have failed. The jury found the existence of each one.

In LeCroy, we soundly rejected the argument that non-statutory aggravating factors must be alleged in the indictment. LeCroy, No. 04-15597, slip op. at 13. Other circuits have done the same. See United States v. Purkey, 428 F.3d 738, 749-50 (8th Cir. 2005); United States v. Bourgeois, 423 F.3d 501, 507-08 (5th Cir. 2005); Higgs, 353 F.3d at 298-99. The non-statutory aggravating factors, although relevant to determining whether a jury decides to impose the death penalty, do not make a defendant statutorily eligible for any sentence that could not be otherwise imposed in their absence. "They are neither sufficient nor necessary under the FDPA for a sentence of death." Purkey, 428 F.3d at 749. This rule comports with recent Supreme Court precedent because a non-statutory aggravating factor does not "increase the penalty for a crime beyond the prescribed statutory maximum," see Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), nor does it somehow allow the imposition of a more severe sentence than could have been imposed without it.

71

See Blakely v. Washington, 542 U.S. 296, 303-04 (2004). Thus, a non-statutory aggravating factor is not one of those "facts legally essential to the punishment" that must be included within the indictment. See id. at 313.[16]

## N.  Pecuniary Gain

Brown further claims that the district court erred in denying his motion for a directed verdict on the aggravating circumstance of pecuniary gain and in improperly instructing the jury regarding the scope of pecuniary gain. Motions for directed verdicts have been abolished since the creation of the Federal Rules of Criminal Procedure, and Brown's motion properly should be treated as one seeking a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, see United States v. Tatum, 496 F.2d 1282, 1285 n.1 (5th Cir. 1974), the denial of which we review de novo. United States v. Acosta, 421 F.3d 1195, 1197 (11th Cir. 2005). We review jury instructions de novo, "to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002) (internal quotation marks

---

[16]However, even if it were constitutional error to omit the non-statutory aggravating factors from the indictment, in this case that error would be harmless beyond a reasonable doubt. See Allen, 406 F.3d at 945 (holding that the failure to include statutory aggravating factors in the indictment was subject to a harmless error analysis); Robinson, 367 F.3d at 286 (same). Brown had notice of the non-statutory aggravating factors the government intended to use at trial, and the evidence "overwhelmingly shows that there existed probable cause to charge [Brown] with the [non-statutory] aggravating factors used in his sentencing." Robinson, 367 F.3d at 288-89.

omitted).

The government charged two statutory aggravating factors: (1) the defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, 18 U.S.C. § 3592(c)(6); and (2) the defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. 18 U.S.C. § 3592(c)(8). The jury found that both aggravators applied.

Brown argued to the district court, in the course of requesting jury instructions and again in his motion for a directed verdict, that the "pecuniary value" aggravating factor does not apply when the death-eligible offense (here, murder) is the culmination of a robbery. Essentially, Brown says, the pecuniary gain aggravating factor can apply only when the defendant knows in advance he will receive something of pecuniary value by committing the murder; he offers the example of murder-for-hire. The district court rejected Brown's argument, denying the motion for a directed verdict and instructing the jury on pecuniary gain. Brown reprises these same arguments on appeal, relying on two cases; United States v. Bernard, 299 F.3d 467 (5th Cir. 2002) and United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000). Neither supports his claim.

In Chanthadara, the defendant was convicted of robbery under the Hobbs

73

Act and using a firearm in a crime of violence under circumstances constituting first-degree murder (the conviction for which death was authorized). When the district judge instructed the jury that it had to find that "the offense" was committed in the expectation of receiving something of pecuniary value, he did not clarify whether the offense was robbery or murder. The Tenth Circuit held that section 3592 of Title 18 requires "that the pecuniary gain factor apply where the gain was expected as a result of the victim's death." Chanthadara, 230 F.3d at 1263 (internal quotation marks omitted). In other words, the murder, and not the robbery, had to be committed with the expectation of receiving something of pecuniary value. Id. at 1264 (holding that "[t]he instruction failed to specify the 'offense' to which it referred was the homicide, not the underlying robbery, and thereby failed to impose a necessary limitation. Therefore, the instruction was erroneous.").

In Bernard, the defendant was charged with murder committed on federal land. It was alleged that Bernard and his co-defendants set out to commit a robbery. They carjacked a young couple, took their ATM cards, demanded the pin numbers, and forced the victims into the trunk of their own car. The defendants withdrew money from the victims' accounts and then proceeded to drive around, with the victims still in the trunk, for several hours. Eventually, the defendants

74

drove to a remote area on the Fort Hood military reservation and shot and burned both victims, stating that they had to kill the couple because the victims had seen the attackers' faces. The jury imposed the death sentence, finding that the pecuniary gain aggravating factor applied. Bernard, 299 F.3d at 471-73.

The Fifth Circuit concluded that the pecuniary gain aggravating factor did not apply, holding that the "aggravating factor is only applicable where the jury finds beyond a reasonable doubt that the murder itself was committed 'as consideration for, or in the expectation of' pecuniary gain." Bernard, 299 F.3d at 483. The court found that the defendants were not hired to commit the murder, and they did not commit the offense of murder in expectation of pecuniary gain. Rather, the sole reason for the murder was to prevent the victims from reporting the crimes to the police. Accordingly, the court found the evidence legally insufficient to support the "pecuniary gain" aggravating factor. Id. at 483-84 (rejecting the government's argument that the murder was a "necessary step" in finishing the carjacking plan).

Neither Chanthadara nor Bernard supports the argument that the pecuniary gain factor is somehow inapplicable in cases involving a robbery or that the factor is limited to cases of murder-for-hire. Rather, they simply stand for the unremarkable proposition that the murder itself, and not an underlying robbery,

75

must be committed in expectation of something of pecuniary value. See also

United States v. Barnette, 390 F.3d 775, 807-08 (4th Cir. 2004), vacated on other

grounds, 125 S. Ct. 92 (2005) (finding, in a case involving carjacking and murder,

that the district court's instructions properly limited the pecuniary gain factor to the

murder, and that the evidence supported the jury's finding that the murder itself

was committed with the expectation of receiving pecuniary gain); United States v.

Roman, 371 F. Supp. 2d 36, 46 (D.P.R. 2005) (rejecting the defendants' motion to

strike the pecuniary gain aggravating factor because the murder and robbery were

committed "practically simultaneous[ly]" and therefore a jury could properly infer

that the murder was committed for the express reason to effect the robbery, rather

than being incident to, or as an afterthought to the robbery); United States v.

Cooper, 91 F. Supp. 2d 90, 105-06 (D.D.C. 2000) (denying defendant's motion to

strike the pecuniary gain aggravating factor because a jury could reasonably infer

that the murder of a store employee during an unsuccessful robbery could have

been motivated by the fact that the employee was frustrating the robber's ultimate

goal, which was to obtain money from the robbery).

Quite simply, the "pecuniary gain" aggravating factor may apply in the

"murder-for-hire" scenario (if the defendant committed the murder "as

consideration for the receipt of . . . anything of pecuniary value") or in the robbery

76

scenario (if the defendant committed a concomitant murder "in the expectation of the receipt of anything of pecuniary value"). See 18 U.S.C. § 3592(c)(8). The "consideration" and "expectation" clauses are two separate ways by which the pecuniary gain factor may be satisfied, and they both must have meaning. See Cooper, 91 F. Supp. 2d at 105 (discussing the two separate prongs). The pecuniary gain factor will not necessarily apply to every robbery/murder scenario, however, and, therefore, we must examine the facts of this case.

The only direct testimony presented at trial describing Gaglia's actual death is found in Brown's videotaped confession. He offers little that occurred between when he initially jumped through the counter window and when he started riding home on his bike. Brown stated that he did not go to the Post Office with the intention of hurting Gaglia; instead, he testified he used the knife just to scare her. He suggested that if he "put her in shock . . . she is not going to be coherent," which, presumably, would have lessened the chance that she would be able to later identify him.

Brown said that he tripped when going through the counter window, and "accidently" cut Gaglia. Although it is not entirely clear, presumably that initial stab wound occurred before he gained control of the money orders, because it appears from his testimony that he did not obtain the money orders until after he

77

vaulted through the window. The medical examiner testified that Gaglia had ten stab wounds, two of which could have been fatal. He was unable to identify the order in which the wounds occurred, and Brown has no recollection of any stabbing after the initial wound that happened "accidently" while he was going through the window. Thus, because that first wound may have been one of the two fatal wounds, the jury could reasonably have found that Brown killed Gaglia before he had control of the money orders, and that the killing was necessary so that Brown could complete the robbery (which, obviously, carried with it the expectation of pecuniary gain).[17]

Additionally, there is evidence from which the jury could find that Gaglia put up a struggle. Brown testified that she said nothing during the incident and that she did not fight back. However, the medical examiner testified that two of the ten stab wounds were to the victim's extremities -- the anterior section of her left forearm and the back of her left wrist. The doctor explained that when an individual receives multiple stab wounds, cuts found on the extremities are classically described as defensive types of injuries. If the jury credited the medical

---

[17]Moreover, although Brown admits only the initial "accidental" stabbing, the physical evidence establishes that Gaglia was stabbed ten times. For all we know (and for all the jury knew), Brown might have inflicted all ten of those wounds (including the two fatal ones) before he gained control of the money orders. Thus, a jury could reasonably conclude that Brown killed Gaglia before he stole the money orders and that the killing was carried out so he could complete the robbery.

78

examiner's testimony, it could reasonably have concluded that Gaglia was struggling and that Brown had to kill her in order to successfully complete the robbery. See Roman, 371 F. Supp. 2d at 46. Either of the two scenarios provide a reasonable basis for the jury to conclude that Brown killed Gaglia in the expectation of pecuniary gain.

To the extent the defendant challenges the sufficiency of the evidence on this point, we are required to draw all reasonable inferences in the government's favor. United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005). To affirm the district court's denial of what should be viewed as a Rule 29 motion, "we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." Id. (quotation marks omitted). Because the murder and the robbery occurred nearly simultaneously, and because there is conflicting evidence regarding the extent to which Gaglia may have resisted, a jury reasonably could have found that Brown committed the murder in expectation of pecuniary gain.

The jury instructions are a somewhat closer question. In explaining the various findings the jury would have to make in the penalty phase, the district court began by stating that "[y]ou have found the defendant guilty of two capital offenses, Counts 1 and 2 of the indictment. You must now decide two questions as

to his punishment." Thus, the court made it clear from the outset that the "offenses" under consideration in the penalty phase were related to the <u>murders</u> alleged in counts one and two (robbery was count three). Later in the instructions, when describing the pecuniary gain aggravating factor, the court offered the following explanation: "Pecuniary gain means the expectation of the receipt of anything of economic value, benefit, or advantage. There is no requirement that the government prove that something of value actually changed hands, only that the defendant expected to receive something of value."

The district court could have stated more explicitly that the expectation of pecuniary gain must arise from the <u>murder</u> itself, and not from the robbery. However, the trial judge plainly narrowed the field of consideration to the murder counts, i.e to <u>counts one</u> and <u>two</u> at the outset of the instructions, and thus, adequately tied pecuniary gain to the murder. The trial court did not misstate the law. When the instructions are not a misstatement of the law, "the trial judge is given wide discretion as to the style and wording employed in the instruction." <u>United States v. Fulford</u>, 267 F.3d 1241, 1245 (11th Cir. 2001). "Under this standard, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." <u>Id.</u> (quotation marks omitted). "We will reverse the district court . . . only if we are

left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." Id. (quotation marks omitted).

Here, the district judge gave an initial limiting instruction making clear that the capital offenses were the murder allegations in counts one and two. In Barnette, the Fourth Circuit found pecuniary gain instructions sufficient when the district court stated that the government had to prove that "the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value." Barnette, 390 F.3d at 805. The instructions in this case were nearly identical, but for the fact that there was a temporal break between the mention of the applicable counts (one and two) and the specific discussion of the pecuniary gain. That short temporal break is not enough to create a "substantial and ineradicable doubt" as to whether the jury understood the instructions, and we therefore conclude that the district judge did not commit reversible error when he instructed the jury. Cf. Chanthadara, 230 F.3d at 1263-64 (noting that the instruction wholly failed to specify the "offense" to which the aggravating factor applied).

## O. Right Of Cross-Examination On Remand

Finally, Brown contends the district court erred in failing to hold a post-remand evidentiary hearing. After this case was initially appealed, Brown moved

81

this Court for a remand to the district court for reconstruction of the record, based on his belief that there may have been ex parte hearings, which were not transcribed, related to his request for funds for a forensic social worker and a future dangerousness expert. We granted the defendant's motion and remanded the case to the district court for the limited purpose of:

> (1) determining whether there are, in fact, any missing transcripts of ex parte hearings on the applications for funding for a forensic social worker or an expert on Appellant's future dangerousness to prison staff and inmates, or both, and (2) if the district court determines there are such missing transcripts, it should attempt to reconstruct, as provided in Fed. R. App. P. 10(e), those materials.

Brown filed no motions in the district court upon remand, and, on February 10, 2005, the district court entered an order finding that there were no missing transcripts and thus nothing to reconstruct. The district court stated that it had "searched its records and consulted with its Court Reporter. No such ex parte transcripts exist. Nor does anyone on the Court's staff recall any un-recorded hearings in this case. Especially since this is a capital case, the Court was meticulous about thoroughly documenting all motions and rulings." The district court observed that no party had filed a proffered reconstruction for the court's approval pursuant to Federal Rule of Appellate Procedure 10(c), but added that it would reconsider its ruling if counsel could "point to any evidence that they in good faith believe should alter this finding."

Brown moved for reconsideration, arguing that the district court should have held an evidentiary hearing at which time it could have heard from Brown's trial counsel and the magistrate judge. The district court denied the motion, concluding that Brown had still not filed a reconstruction of any unrecorded conversations pursuant to Rule 10(c), and had instead indicated only that an unidentified ex parte communication had taken place between the magistrate judge and trial counsel. Additionally, the district court noted that the magistrate judge and his staff "report no recollection of any un-recorded contacts with defense counsel concerning any substantive matters."

On appeal, Brown argues that the trial court denied him the right to confront witnesses by failing to conduct an evidentiary hearing to determine whether the record required reconstruction. We review a district court's failure to conduct an evidentiary hearing for abuse of discretion. See United States v. Gay, 251 F.3d 950, 951 (11th Cir. 2001); Ashcroft v. Paper Mate Mfg. Co., 434 F.2d 910, 915-16 (9th Cir. 1970) (in the context of a Rule 10(e) remand).

The district court did not abuse its discretion by failing to hold an evidentiary hearing for two reasons. First, we did not require a hearing in our remand order. In prior cases where we have wanted the district court to hold an evidentiary hearing after remanding a case pursuant to Rule 10(e), we have made

83

the order explicitly clear.  See United States v. Preciado-Cordobas, 923 F.2d 159,

160 (11th Cir. 1991) (remanding with instructions to "conduct an appropriate

hearing . . . for the purpose of supplementing the record" (quoting United States v.

Selva, 546 F.2d 1173, 1174 (5th Cir. 1977)) (alterations in original)).  We did not

do so here, instead instructing that the district court should determine whether there

were any missing transcripts, and, if so, only then should it attempt to reconstruct

the record.

Second, Rule 10 provides a detailed method by which the record should be

supplemented when proceedings were not recorded or a transcript is unavailable:

the appellant prepares a statement of the evidence or proceedings, and serves the

appellee, who may file objections or proposed amendments, after which the matter

is presented to the district court "for settlement and approval."  Fed. R. App. P.

10(c).  Brown made no proffer to the district court regarding any hearings that

were not transcribed or for which a transcript was unavailable.  Indeed, even after

the district court invited him to do so, Brown still only obliquely referred to an ex

parte communication between trial counsel and the magistrate judge.  He did not

provide any details of the substance of that communication, let alone comply with

the "statement of the evidence or proceedings" requirement of Rule 10(c), despite

the fact that his appellate attorney was in contact with the trial counsel that

allegedly engaged in these communications. The district court acted well within its discretion finding -- based on its inquiry of its own staff, the court reporter, and the magistrate judge -- that there were no <u>ex parte</u> communications.[18]

## III.

We have considered all the arguments of both parties, and, after thorough review of the record we are confident the district court did not commit reversible error. Brown's conviction and sentence are **AFFIRMED**.

---

[18]Moreover, even if we were to find that the district court should have conducted a hearing, Brown's absence at that hearing would not have violated his due process or Sixth Amendment right to be present. <u>See</u> <u>United States v. Boyd</u>, 131 F.3d 951, 954 (11th Cir. 1997) (finding that a defendant's absence from an evidentiary hearing related to his motion for a new trial did not violate his rights under the Sixth Amendment or the Due Process Clause, in part because there was no showing that his presence would have contributed to the fairness of the proceeding). Brown is entitled to no relief on this claim.

Finally, Brown also argues on appeal that he intended to present two other arguments at the post-remand hearing, both related to an allegedly incomplete record of the jury selection process. However, those issues were outside the scope of our order on remand and thus would not have been appropriate for consideration even if the district court had conducted a hearing.

BARKETT, Circuit Judge, concurs in the result.