[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-13002
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 29, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00037-CR-1-SPM-AK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOAQUIN GOMES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(May 29, 2008)**

Before BIRCH, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Joaquin Gomes, a registered sex-offender in Florida, was serving a state probation term at the time he committed the federal crimes at issue in this case. Gomes appeals his convictions and sentences imposed after a jury found him guilty of possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); receiving child pornography, in violation of 18 U.S.C. § 2252(a)(2)(B); and producing child pornography, in violation of 18 U.S.C. § 2251(a).

Gomes first argues that the district court erred in denying his motion to suppress (1) statements he made during an interview outside of his house with federal agents, after he requested an attorney and without having been given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), and (2) evidence subsequently seized from his home pursuant to a warrantless search. Second, Gomes contends that the district court erred in admitting the expert testimony of Marilyn M. Barnes, because the court improperly limited voir dire into the data supporting Barnes's opinion, and because both Barnes and the evidence she relied upon were unreliable. Third, Gomes maintains that the district court erred by allowing Ophelia L. Jakobsen, Gomes's former step-daughter, to testify because her testimony was conditioned on another person also testifying, and that person did not testify. Gomes also urges that her testimony should have been excluded under Federal Rules of Evidence 402 and 403 because it was

irrelevant and its probative value was outweighed by unfair prejudice. Finally, Gomes believes that the district court erred because it should have imposed his sentences to run concurrently with his undischarged state sentence, pursuant to U.S.S.G. § 5G1.3(b). Based on a review of the record and the parties' briefs, we discern no reversible errors and AFFIRM Gomes's convictions and sentences.

## I. BACKGROUND

In March 2006, the FBI received information suggesting that Gomes might be involved with child pornography because his name appeared in a database of persons who had used credit cards to access internet sites containing child pornography. Stephen W. Amos and Wallace Adams, special agents with the FBI, and Mark Morgan, a computer examiner from the Levy County, Florida, Sheriff's Office, went to Gomes's residence and waited for him to arrive. The agents knew that Gomes was serving a term of state probation for a conviction of lewd and lascivious assault on a minor. When Gomes arrived, the agents approached him at a locked fence enclosing two trailer homes on the property. The agents then informed Gomes of their identities and told Gomes that they wanted to interview him regarding their suspicions that he had images of child pornography on his computer. Gomes denied he was involved in child pornography.

The agents asked Gomes for his consent to search his computer, which he refused. Around this time during the interview, Gomes stated in substance that he "might want to call an attorney." R2 at 52. Agent Amos then said he was stopping the interview and would not ask any more questions, but that he would be contacting Gomes's probation officer, Mike Hinson, to notify him that Gomes had changed his job without notifying the probation office. Gomes became upset and said, "Don't call him. He'll put me in jail." Id. Agent Amos told Gomes that he was obligated to contact Officer Hinson "for the purpose of explaining what had transpired at the residence during the course of the interview." Id. at 34-35. Gomes again begged him not to contact Officer Hinson because he feared being arrested. At that point, Gomes informed the agents that he had images of child pornography on his computer. Id. at 44. During Agent Amos's telephone conversation with Officer Hinson, Gomes indicated that he had "a ton of it in there." Id. at 52. Agent Amos then told Gomes that he was not under arrest, but that Gomes was not free to enter his home. Id. at 45.

While waiting for Officer Hinson to arrive, Gomes was kept outside of the fence of his residence because the agents feared that he would destroy evidence if he were allowed inside. Id. at 36. When Officer Hinson arrived, the agents allowed Officer Hinton to interview Gomes alone. Officer Hinson knew Gomes

4

had requested an attorney, and, nevertheless, Officer Hinson asked Gomes if he would find anything in the house if he searched it. Id. at 108-09. Gomes told Officer Hinson that he would find some "kiddy porn" if the home were searched. Id. at 106. Gomes took Officer Hinson and Officer Morgan into the residence, led them to the bedroom, pulled out a bag containing compact discs from under the bed, and gave them to Officer Hinson. Officer Morgan put one of the discs in his computer and opened files that appeared to be child pornography. Gomes was then arrested for violating the terms of his probation.

Through a subsequent search of Gomes's computer, pursuant to a warrant, Officer Morgan found images of child pornography, and discovered that some files had been viewed on the internet and saved to the hard drive. 601 images in Gomes's possession matched those in the Department of Justice's database of known child pornography. In addition, Officer Morgan located thousands of suspected files and over 500 videos believed to be child pornography on Gomes's discs and computer. Gomes's digital camera contained three images and the data from other deleted images. Officer Morgan tracked one image from the camera to the compact discs that had come from under Gomes's bed, and five other images on the discs came from the same camera.

A federal grand jury indicted Gomes for (1) possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), ("Count One"); (2) receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B) and (b)(1), ("Count Two"); and (3) producing child pornography, in violation of 18 U.S.C. § 2251(a) and (e), ("Count Three"). R1-26 at 1-3. Before trial, Gomes filed a motion to suppress statements and evidence, arguing that the statements and evidence were obtained in violation of the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution and Federal Rule of Criminal Procedure 41. Gomes argued, inter alia, that his confession to possessing child pornography was a result of continued interrogation following his request for an attorney and that the evidence resulting from the search of his home and computers was the fruit of those illegally obtained statements. In the motion, Gomes set out that he had previously been sentenced to two years of community control followed by 13 years of sex offender probation, and his conditions of probation provided that Gomes, "will not own, view or possess sexually explicit material or stimulating visual or auditory material by means including telephone, electronic media, computer programs or computer services" and that he "will submit to warrantless search by your officer of your person, residence or vehicle . . . [.]"[1] R1-17 at 3 n.4. The government responded

---

[1] Gomes's state probation conditions do not appear in the record, but this provision of his state probation is not challenged, and Gomes references it in both his motion to suppress and his

that Gomes's initial confession should not be analyzed under <u>Miranda</u> because the setting was non-custodial. The government also argued that the search of Gomes's home was proper because it was based upon Officer Hinson's reasonable suspicion that Gomes possessed child pornography, such that the evidence seized was not subject to suppression.

Without holding an evidentiary hearing, the court denied Gomes's motion, first concluding that Gomes's statements were not the product of custodial interrogation because the interview took place at Gomes's home and ceased upon his request for an attorney. R1-21 at 2 n.1. The court framed the issue relating to the evidence resulting from the search of his home and computer as, "whether a federal probation officer in the same circumstances would have had the right to conduct the warrantless entry into and search of Defendant's home." <u>Id.</u> at 4. The court considered that (1) the FBI agents were aware that Gomes was involved in downloading child pornography because his name appeared in their database; (2) his criminal history revealed that he was on state probation for a conviction of lewd and lascivious assault on a child under 16; (3) he admitting touching his step-daughter's genitals; (4) he admitted observing pornographic "pop-ups" on his computer; and (5) he volunteered to cooperate with the agents once they advised

---

appellate brief. <u>See</u> R1-17 at 3 n.4; Appellant's Br. at 20 n.1.

him that his probation officer was to be contacted. Id. at 5. The court concluded that these factors gave the agents and probation officer reasonable suspicion to conduct the warrantless search of Gomes's residence and computer. Id. at 4-6.

Gomes also filed a motion in limine, arguing that the expert testimony of Marilyn M. Barnes should be excluded from evidence. R1-31. Barnes was to testify that a female subject in five photographs seized from Gomes's home was between 11 and 16 years old, based upon her genitalia. Id. at 1. Gomes argued that it was unlikely that a photograph of external female genitalia could support Barnes's opinion within a reasonable degree of medical certainty that the subject was an adolescent minor. Id. The government opposed Gomes's motion, arguing that Barnes's testimony was based on extensive medical training and clinical experience, and it attached Barnes's resume, which set out her experience and qualifications. The court denied the motion, finding that Barnes's testimony would be admissible to assist the jury in making its decision. R1-34.

Gomes elected to proceed to a jury trial. On cross-examination by Gomes's counsel, Agent Amos testified as follows. While Agent Amos was questioning Gomes, Gomes indicated that he should talk to an attorney, and Agent Amos repeatedly instructed him that no more questions would be asked, the interview was concluded, and any statements made could be used against him in court. R2 at

8

43-44. Agent Amos then indicated to Gomes that he was going to contact Gomes's probation officer, and Gomes "dropped to his knees," "cried out for Jesus," pleaded for Agent Amos not to call, and indicated that he would cooperate. Id. at 44. At that point, Agent Amos told Gomes not to make any statements because they could be used against him in court. Gomes then told Agent Amos that he had images of child pornography on his computer.

The government then called Officer Morgan to testify. Officer Morgan testified that he accompanied Agent Amos and Agent Taylor to Gomes's residence, and they waited outside of the gate because Gomes was not home when they arrived. Id. at 50-51. After Gomes returned and got out of his truck, Morgan and the agents approached him, and Agent Amos began to interview Gomes. Id. at 51. Agent Amos asked Gomes for consent to look at his computers, and Gomes indicated that he might want to call an attorney. Id. at 52. When Officer Hinson arrived, Gomes's probation officer, Officer Hinson asked Officer Morgan to assist him in viewing computer material in Gomes's residence. Id. at 53. After a brief search of Gomes's home and computer, Officer Hinson arrested Gomes. Id. at 55. Certain items were seized from Gomes's residence pursuant to Offier Hinson's request. Id. Subsequently, Officer Morgan was involved in obtaining a state search warrant to search Gomes's home. Id. The items seized pursuant to that

search included three desktop computers, 12 hard drives, a digital camera, a web camera, a printer, and 46 compact discs. Id. at 58.

The government then called Officer Hinson, who testified that Agent Amos contacted him and requested information about Gomes because Agent Amos wanted to interview Gomes. Agent Amos contacted him again, indicating that Gomes had made a statement, and Officer Hinson went to Gomes's home to conduct a probation search. Id. at 106. When Officer Hinson arrived, he talked with Agent Amos, who gave him some background. Hinson was aware that a subsequent search warrant was obtained to seize the evidence. Id. at 108. On cross-examination, Officer Hinson testified that he knew Gomes had requested an attorney, and, notwithstanding that, he asked Gomes if he would find anything in the house if he searched it. Id. at 108-09.

Next, the government called Ophelia L. Jakobsen, who testified that her mother, Sandra K. Nilsen, married Gomes in November 2005. Id. at 109-11. Gomes objected to her testimony based on Rule 403. The government responded that her testimony was for the purpose of establishing that Gomes had access to young girls of whom to take the photographs. The court overruled the objection. Jakobsen resumed her testimony and indicated that she had a sister, Brittany, who would have been 13 years old in 2005, at the time the pictures were taken. Id. at

10

113. She stated that she and Brittany had stayed at Gomes's house, and Brittany had been there alone with Gomes. Id. She also testified that Brittany had other friends who were approximately the same age and who had spent time at Gomes's residence. Id. at 113-14.

The government then called Nilsen, Gomes's ex-wife, who testified that she had known Gomes since July 2005, had married him in November 2005, and had been to his trailer. She and Brittany had stayed at Gomes's residence once, and Brittany had friends around her own age. Id. at 116-17. Officers had shown her pictures taken from Gomes's camera, one of which was a picture of a "little girl," but Nilsen did not know the identity of the girl. Id. at 118-19. On cross-examination, Nilsen testified that Brittany had only been alone with Gomes when Nilsen had a heart attack and that Brittany's friends had very seldom been at Gomes's residence. Id. at 119-20. After Nilsen's testimony, the government indicated that it would call Brittany to testify. Id. at 121.

Instead, the government called Marilyn M. Barnes, and Gomes requested voir dire to establish her expertise, which the government granted. Outside the presence of the jury, she testified that she had been an advanced registered nurse practitioner with the University of Florida Child Protection Team for almost 12 years. She had a master's degree in pediatric nursing and had worked the majority

of her career in pediatrics. She had been to multiple conferences relating to child sexual abuse and child abuse and spoken at a conference on child sexual abuse. She had three articles published on taking histories from abused or neglected children. She had seen over 300 children a year, about one-half of whom were seen for sexual abuse, and she had seen a total of approximately 3,600 children for abuse or neglect. She had been qualified as an expert in child sexual and physical abuse cases and had appeared as an expert in 105 cases. She had previously been asked to use her expertise in adolescent growth and development to examine photographs for law enforcement purposes, and she had rendered opinions regarding the age of children in photographs.

Gomes continued his <u>voir</u> <u>dire</u>, and Barnes testified that she had never been qualified as an adolescent growth and development expert to render an opinion as to the age of a person based solely on their genitalia. She had been asked to render an opinion as to the age of a child based on photographs in about four or five investigations, and she rendered an opinion based on the genitalia alone in two or three of those. Barnes testified regarding the methods used for determining age based on genitalia. Barnes also testified that the pictures she was asked to view in this case were "not the clearest photos I ever saw," but showed the genital structures. <u>Id.</u> at 128. She indicated that one of the photos in the present case

showed the distribution of pubic hair fairly clearly, and the others are "iffy." Id. at 129. The district court sustained objections to Gomes's continued questioning regarding the clarity of the pictures Barnes examined for this case. The judge stated, "Counsel, I think we have gotten beyond the admissibility and we are now in the area of credibility," and that "it's not correct voir dire. You can do all this on cross-examination." Id. Barnes continued to testify that the principles and methods she used were reliable and had been subjected to peer review. While she had never published on the methods upon which she relied, she identified articles and textbooks on the subject.

On direct-examination in front of the jury, Barnes repeated her qualifications and described how she determines a child's age from a photograph. The government moved to admit Barnes as an expert in adolescent growth and development, Gomes objected, and the court overruled the objection and admitted her as an expert. Id. at 138. Barnes stated that the photographs provided her with sufficient information to render her opinion and testified that "this child is certainly under the age of 18, and very likely under the age of 16, and that's even allowing for some outliers. I believe that the child is probably 14 or younger." Id. at 142. Gomes objected to her testimony under Rule 403, and the court overruled the objection.

On cross-examination, Barnes testified regarding the age of puberty onset and developmental variations. She testified that there was "some blurriness" in the photographs she analyzed. Id. at 144. On re-direct, she testified that her opinion took into account the developmental variations about which the defense asked. The government again indicated that it intended to call Brittany the next day, but did not call any additional witnesses the next day. The jury found Gomes guilty on all three counts of the indictment.

The probation office prepared a presentence investigation report ("PSI") and grouped all three counts together, pursuant to U.S.S.G. § 3D1.2 (2006). Gomes's base offense level was 18, pursuant to U.S.S.G. § 2G2.2. The probation officer added 23 levels for various specific offense characteristics, under U.S.S.G. § 2G2.2(b)(2) through (b)(7). One of the specific offense characteristics, for which Gomes received a five-level increase, was that he "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor," pursuant to U.S.S.G. § 2G2.2(b)(5). The enhancements raised Gomes's total offense level to 41. The probation officer described Gomes's criminal history and detailed a 2001 state conviction on 1 count of lewd and lascivious assault on a child under the age of 16. For that crime he was sentenced to 2 years of community control to be followed by 13 years of sex offender probation. In May 2006, he pled guilty to violating his

14

community control by possessing child pornography, his term of supervision was revoked, and he was sentenced to 10 years of imprisonment with credit for 474 days served. Based on Gomes's criminal history, his criminal history category was III. His adjusted offense level of 41 and criminal history category of III yielded a guideline range of 360 months to life imprisonment, but because the statutory maximum for Count Three was 600 months of imprisonment, pursuant to 5G1.1(c)(1), his guideline range became 360 to 600 months of imprisonment.

At the sentencing hearing, Gomes argued that he had 61 to 91 months of undischarged prison time and his present sentence should be imposed concurrently with that undischarged time or reduced by that time, pursuant to U.S.S.G. § 5G1.3(b). The court disagreed, finding that it had discretion, under U.S.S.G. § 5G1.3(c), to order that Gomes's sentence run consecutively with his undischarged state sentence because he committed the instant offense while on probation for his state conviction. R4 at 10. The court indicated that it had considered the factors in 18 U.S.C. § 3553(a), the advisory guideline range, and the policy statements issued by the Sentencing Commission. The court sentenced Gomes to 240 months of imprisonment as to Count One, 480 months as to Count Two, and 600 months as to Count Three, all to run concurrently, and ordered the sentence to run consecutively to any existing state sentence. When Gomes was

15

asked if he had any objections to the court's findings of fact or conclusions of law, his counsel stated, "[n]one other than previously raised." Id. at 13-14. This appeal followed.

## II. DISCUSSION

A. The District Court Properly Denied Gomes's Motion to Suppress

"Review of a district court's denial of a motion to suppress is a mixed question of law and fact." United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007). "[I]n reviewing a denial of a motion to suppress, we review the entire record, including trial testimony." United States v. Newsome, 475 F.3d 1221, 1224 (11th Cir.) (per curiam), cert. denied, 128 S. Ct. 218 (2007); see also United States v. Pearson, 448 F.2d 1207, 1210 (5th Cir. 1971) ("Evidence adduced at trial may be considered even though the evidence on the motion to suppress was insufficient to justify the search."). We consider the evidence brought forth at trial in determining whether the denial of a motion to suppress constitutes reversible error. Newsome, 475 F.3d at 1224; Pearson, 448 F.2d at 1210. "We review the district court's findings of fact for clear error[,]" construing the evidence in the light most favorable to the party that prevailed in the district court, and "[w]e review the district court's interpretation and application of the law de novo." Delancy, 502 F.3d at 1304.

16

1. Gomes's Pre-Arrest Statements Were Properly Admitted at Trial

The prosecution cannot introduce a defendant's statements made in response to custodial interrogation without first informing the defendant of his rights under <u>Miranda</u>. <u>Miranda</u>, 384 U.S. at 444, 476, 86 S. Ct. at 1612, 1629. In <u>United States v. Castro</u>, we held that before <u>Miranda</u> warnings are required, "it must be established that the subject was both 'in custody' and under 'interrogation' by police officers." <u>United States v. Castro</u>, 723 F.2d 1527, 1530 (11th Cir. 1984) (per curiam). To determine whether a suspect is "in custody" the Supreme Court has set out two distinct inquiries. "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995) (footnote omitted). The court must then determine whether the suspect was subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Id.</u> (quotation omitted).

We have acknowledged that "courts are <u>much</u> <u>less</u> <u>likely</u> to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." <u>United States v. Brown</u>, 441 F.3d 1330, 1348 (11th Cir. 2006) (quotation and alteration omitted), <u>cert. denied</u>, 127 S.

17

Ct. 1149 (2007); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (noting that "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial").  Other relevant factors to determine custody include whether the suspect was physically restrained or told he was under arrest.  See United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir. 1987) (per curiam) (concluding that suspect,  who was neither arrested nor told that he was under arrest, was "not in custody for the purposes of Miranda"). "Unambiguously advising a defendant that he is free to leave and is not in custody . . . generally will lead to the conclusion that the defendant is not in custody . . . ." Brown, 441 F.3d at 1347.  The Supreme Court has stated that an officer's suspicions regarding a suspect "may bear upon the custody issue if they are conveyed" to the suspect, however, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." Stansbury v. California, 511 U.S. 318, 325, 114 S. Ct. 1526, 1530 (1994) (per curiam).

In this case, Gomes made self-incriminating statements to the agents regarding his possession of child pornography without having been arrested and not having been informed of his rights under Miranda.  Therefore, we must

18

determine whether or not Gomes was in custody at the time he made the statements. The evidence adduced at trial shows that Gomes was interviewed outside of a locked fence at his residence – a familiar setting for Gomes – which weighs against the finding that he was in custody. R2 at 34; Brown, 441 F.3d at 1348. Gomes was not physically restrained in any way and he was not told that he was under arrest, which are two additional factors that weigh against a finding of custody. See generally R2 at 30-55; Phillips, 812 F.2d at 1362. While the officers did say that they suspected Gomes of having child pornography on his computer, an officer's articulated suspicions are not dispositive of the inquiry. Stansbury, 511 U.S. at 325, 114 S. Ct. at 1530. We conclude that the officers' stated suspicions did not render their interview with Gomes custodial because, after Agent Amos said that he would be calling Hinson, Gomes's probation officer, "for the purpose of explaining what had transpired at the residence during the course of the interview," R2 at 34-35, Gomes begged Amos not to call because he feared being arrested, indicating that Gomes did not think he was in custody at that point. Id. at 35. Then, at some point during Amos's call with Hinson, Gomes volunteered that he possessed child pornography. Gomes had said nothing incriminating up until this point, and there is no indication that he was not free to enter his home or to leave the scene even if his probation officer were called. Therefore, Agent

19

Amos's statement that he was going to call Gomes's probation officer cannot be deemed to have restricted Gomes's freedom of movement such that Gomes was in custody when he made self-incriminating statements.

The totality of the circumstances establishes that Gomes was not in custody when he made self-incriminating statements. Recall, the agents prevented Gomes from entering his house only <u>after</u> he had made self-incriminating statements regarding his possession of child pornography. The facts that the district court relied upon to deny Gomes's motion to suppress were in conformity with the facts established at trial. Accordingly, the district court did not err in denying Gomes's motion to suppress his statements.

2. The Evidence Seized from Gomes's Home Was Properly Admitted

Federal law governs the admission in federal court of evidence obtained by state officers. <u>United States v. Malekzadeh</u>, 855 F.2d 1492, 1496 (11th Cir. 1988). "The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers." <u>Preston v. United States</u>, 376 U.S. 364, 366, 84 S. Ct. 881, 883 (1964). A probationer's house may be searched based upon reasonable suspicion. <u>United States v. Knights</u>, 534 U.S. 112, 121, 122 S. Ct. 587, 592 (2001). In <u>Knights</u>, the Supreme Court

stated that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id. at 121, 122 S. Ct. at 593. We followed Knights in United States v. Yuknavich and concluded that reasonable suspicion was all that was required to search a probationer's computer, even where the suspect's probation agreement did not require him to submit to warrantless searches. United States v. Yuknavich, 419 F.3d 1302, 1309-11 (11th Cir. 2005).[2] We have explained that a court must look to the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Id. at 1311. To determine whether officers had reasonable suspicion, we "must take stock of everything they knew before searching." Id.

---

[2] Gomes argues that the decisions in Yuknavich and Knights are not controlling because Florida courts have held that evidence obtained pursuant to a search by a probation officer is admissible only in a probation revocation proceeding, not to prove a new criminal offense. Gomes also argues that Florida law expressly limits the authority to conduct warrantless searches to probation officers, but he cites no authority for this proposition. These arguments fail because Knights establishes that the Fourth Amendment allows a search of a probationer's home for either investigatory or probationary purposes. See generally, Knights, 534 U.S. 112, 121, 122 S. Ct. 587. Gomes's argument is also foreclosed by Bamberg v. State, 953 So. 2d 649, 653-54 (Fla. Dist. Ct. App. 2007), a Florida appellate court decision that adopted Knights to conclude that a warrantless search of a probationer's residence could be used for either probationary or investigatory purposes and expressly abrogated earlier Florida state court decisions to the extent that they were superseded by Knights.

21

In this case, Gomes confessed to possessing child pornography on his computer to federal law enforcement officers. As we have explained, his confession was admissible because it was a statement that was not the product of custodial interrogation. Because the officers arrived at Gomes's house with information suggesting that Gomes might be involved in child pornography, and Gomes subsequently confessed to possessing child pornography, the federal agents had particular, objective evidence to support a reasonable suspicion that he was engaged in criminal activity. See Yuknavich, 419 F.3d at 1311. Instead of searching Gomes's residence at that time Gomes confessed, the federal agents contacted Gomes's state probation officer, who, in conjunction with Morgan, conducted the search after being informed of what had transpired. R2 at 106. Because the federal agents informed Hinson of Gomes's confession, Hinson also had reasonable suspicion to search Gomes's residence. Consequently, the evidence obtained by the state officers could be admitted in federal court because the officers had reasonable suspicion to search Gomes's residence. See Preston, 376 U.S. at 366, 84 S. Ct. at 883; Knights, 534 U.S. at 121, 122 S. Ct. at 592. Therefore, the district court did not err by denying Gomes's motion to suppress the evidence seized from the search of his home.

B. The District Court Properly Allowed Barnes's Expert Testimony

We review a district court's decision with respect to the admissibility and reliability of expert testimony for an abuse of discretion and can only reverse a district court's ruling if it is manifestly erroneous. United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc). "A district court has wide discretion in its determination to admit and exclude evidence, and this is particularly true in the case of expert testimony." United States v. Beasley, 72 F.3d 1518, 1528 (11th Cir. 1996) (per curiam) (quotation omitted).

Federal Rule of Evidence 702 provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. To determine the admissibility of expert testimony, trial courts must consider whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert[ v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (quotation omitted). The Supreme Court in Daubert set out some considerations for analyzing the reliability of scientific expert opinion, including (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether it is generally accepted. Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2796-97. "The inquiry envisioned by Rule 702 is . . . a flexible one." Id. at 594, 113 S. Ct. at 2797.

Voir dire questioning established that Barnes had been an advanced registered nurse practitioner with the University of Florida Child Protection Team for almost 12 years and she had a master's degree in pediatric nursing. R2 at 123. She had seen a total of approximately 3,600 children for abuse or neglect, had been qualified as an expert in child sexual and physical abuse cases, and had appeared as an expert in 105 cases. Id. at 125. She had been asked to use her expertise in adolescent growth and development to examine photographs for law enforcement purposes, and she had rendered opinions regarding the age of children in photographs in four or five investigations, two or three of which were based on genitalia alone. Id. at 125-26. Barnes also indicated that the principles and methods she used were reliable and had been subjected to peer review, and she identified articles and textbooks on the subject. R2 at 130-31; Daubert, 509 U.S. at

24

593-94, 113 S. Ct. at 2796-97.  She also described in detail the reasons for her opinion.  See R2 at 136-38.

The district court allowed sufficient voir dire into Barnes's qualifications, methodology, and the data supporting her opinion.  Even though the district court sustained several of the government's objections during Gomes's cross-examination of Barnes, we conclude that the district court allowed enough inquiry to determine that Barnes was qualified to render an expert opinion regarding the age of children in photographs which would assist the jury.  See Fed. R. Evid. 702.  Given that the district court could find that Barnes was sufficiently qualified, her methodology was reliable, and her testimony could help the jury determine an element of the offense, the court did not abuse its discretion in allowing her to testify.  See Frazier, 387 F.3d at 1260.

C.  The District Court Properly Allowed Jakobsen's Testimony

"We review the district court's admission of evidence over a defendant's objection pursuant to Fed. R. Evid. 403 for abuse of discretion."  United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006) (per curiam).  "[W]e view the evidence in the light most favorable to admission, maximizing it's probative value and minimizing its undue prejudicial impact."  Id.  We will find an abuse of discretion "[o]nly if the decision to admit evidence over a Rule 403 challenge is

25

unsupportable when the evidence is viewed in the light most supportive of the decision." Id. (quotation omitted). Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. It is a crime to produce pornography involving a "minor." 18 U.S.C. § 2251(a). A "minor" is defined as "any person under the age of eighteen years." 18 U.S.C. § 2256(1).

In this case, Jakobsen testified that she and her sister, Brittany, who was 13 years old in 2005, had stayed at Gomes's house and that Brittany had been there alone with Gomes. R2 at 113. Jakobsen also testified that Brittany had other friends close to Brittany's age who also spent time at Gomes's residence. Id. at 113-14. This testimony was relevant and probative of whether Gomes had access to girls under the age of 18, which was circumstantial evidence for the government to establish that Gomes had violated 18 U.S.C. § 2251(a). Given that the testimony was probative of a material element of Count Three, the district court did not abuse its discretion in admitting Jakobsen's testimony. See Bradberry, 466 F.3d at 1253.

Gomes argues that the district court erred in allowing Jakobsen to testify because her testimony was contingent upon the government calling her sister, Brittany, to testify, which did not happen. However, while the government did indicate that it planned to call Brittany to testify, R2 at 147, 121, the record does

26

not show that Jakobsen's testimony was in any way conditioned upon Brittany's testimony. Additionally, the government specifically stated that Jackobsen's testimony was for the purpose of establishing that Gomes had access to young girls of whom he could take photographs. Id. at 111. Gomes's argument is without merit.

D. The District Court Properly Imposed Consecutive Sentences

We review a district court's interpretation and application of the Sentencing Guidelines de novo. United States v. Amedeo, 487 F.3d 823, 831 (11th Cir.), cert. denied, 128 S. Ct. 671 (2007). Section 5G1.3(b) of the Sentencing Guidelines provides that if

> a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows: . . . (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

U.S.S.G. 5G1.3(b). The application notes provide that subsection (b) "applies in cases in which all of the prior offense (i) is relevant conduct to the instant offense under the provision of subsection (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct); and (ii) has resulted in an increase in the Chapter Two or Three offense

27

level for the instant offense." U.S.S.G. § 5G1.3, comment. (n.2(A)). Subsection (b) does not apply if the prior offense increased the offense level for the instant offense, "but was not relevant conduct to the instant offense under § 1B1.3(a)(1), (a)(2), or (a)(3)." U.S.S.G. § 5G1.3, comment. (n.2(B)).

Section 5G1.3(c) of the Sentencing Guidelines provides, "[i]n any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(c), p.s. "Subsection (c) applies in cases in which the defendant was on . . . state probation . . . at the time of the instant offense and has had such probation . . . revoked." U.S.S.G. § 5G1.3, comment. (n.3(C)).

"Relevant Conduct" includes (1) "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," U.S.S.G. § 1B1.3(a)(1); (2) "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) . . . that were part of

28

the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2); and (3) "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions . . . ." U.S.S.G. § 1B1.3(a)(3).

Here, it is not disputed that Gomes's prior state court conviction was the basis for a five-level increase in his offense level for engaging in a pattern or practice of sexual behavior which stemmed from his prior conviction, pursuant to U.S.S.G. § 2G2.2(b)(5). The issue turns on whether his previous state conviction constitutes "relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3." U.S.S.G. § 5G1.3(b).

Gomes's 2001 state conviction for lewd and lascivious assault on a child under the age of 16 does not qualify as "relevant conduct" for his present crimes because it did not involve (1) acts or omissions that occurred during, in preparation for, or in avoiding detection for his offense of conviction, see U.S.S.G. § 1B1.3(a)(1); (2) acts or omissions that were part of the "same course of conduct or common scheme or plan" as his present offense, see U.S.S.G. § 1B1.3(a)(2); nor (3) harm resulting from or that was the object of such acts or omissions, see U.S.S.G. § 1B1.3(a)(3). Consequently, though Gomes's 2001 state conviction increased his base offense level for his present offense, it did not constitute

29

"relevant conduct" for his present offense within the meaning of U.S.S.G. § 5G1.3(b). See U.S.S.G. § 2G2.2, comment. (n.1) (indicating that "pattern of activity" in § 2G2.2(b)(5) encompasses two or more instances where the defendant sexually abused or exploited a minor, whether or not it "(A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct"); see also United States v. Anderton, 136 F.3d 747, 751 (11th Cir. 1998) (per curiam) (holding that "pattern of activity" "clearly permits an increased offense level for conduct unrelated to the offense of conviction").

Gomes's situation fits within the definition of § 5G1.3(c) because he was on state probation when he committed the instant offenses, and that probation was revoked. U.S.S.G. § 5G1.3, cmt. 3(C) ("Subsection (c) applies in cases in which the defendant was on . . . state probation . . . at the time of the instant offense and has had such probation . . . revoked"). Because Gomes's 2001 state conviction did not constitute "relevant conduct" for his present offense, the district court properly ordered his sentence to run consecutively to his undischarged state sentence pursuant to U.S.S.G. § 5G1.3(c).

### III. CONCLUSION

Gomes challenges his convictions and sentences possessing child pornography, receiving child pornography, and producing child pornography. The

30

district court properly admitted statements Gomes made to law enforcement agents during non-custodial questioning and evidence seized pursuant to a lawful search of Gomes's residence which occurred after the agents had a reasonable suspicion that Gomes possessed child pornography. During trial, the district court correctly allowed Gomes's step-daughter to testify regarding Gomes's access to children and Barnes to testify as an expert witness to identify the ages of persons depicted in certain photographs. After Gomes was convicted, the district court properly sentenced Gomes to serve consecutive terms because his actions resulting in a prior conviction for lewd and lascivious assault on a minor did not involve "relevant conduct" to his actions that led to the convictions in this case. Accordingly, we affirm Gomes's convictions and sentences.

**AFFIRMED.**